UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LILYANN RYAN, as Administrator of the
Estate of BARTHOLOMEW RYAN, deceased,                         12-CV-5343 (JS)(SIL)
and LILYANN RYAN, individually,

                                        Plaintiff,

          -against-

COUNTY OF NASSAU, COUNTY OF NASSAU
CORRECTIONAL CENTER, NASSAU COUNTY
SHERIFF'S DEPARTMENT, ARMOR
CORRECTIONAL HEALTH SERVICES, INC. and
ARMOR CORRECTIONAL HEALTH SERVICES
OF NEW YORK, INC.,

                                        Defendants.
-----------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' COUNTY OF NASSAU, COUNTY OF NASSAU CORRECTIONAL
CENTER, NASSAU COUNTY SHERIFF'S DEPARMENT AND ARMOR
CORRECTIONAL HEALTH SERVICES, INC. and ARMOR CORRECTIONAL
HEALTH SERVICES OF NEW YORK, INC.'s MOTIONS FOR SUMMARY JUDGMENT**


                              PARKER WAICHMAN LLP
                              6 Harbor Park Drive
                              Port Washington, NY 11050
                              (516) 466-6500
                              Attorneys for Plaintiffs

TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………………ii

INTRODUCTION……………………………………………………………………………..1

PRELIMINARY STATEMENT………………………………………………………………1

THE STANDARD FOR SUMMARY RELIEF………………………………………………3

FACTS NECESSARY TO DECIDE THESE MOTIONS……………………………………...3

ARGUMENT…………………………………………………………………………………...10

   I.   THE CLAIMS AGAINST DEFENDANTS ARE ENTIRELY PROPER UNDER §1983
      AND DEFENDANTS HAVE FAILED TO ELIMINATE ALL MATERIAL QUESTIONS
      OF FACT, THUS JUSTIFYING DENIAL OF THEIR MOTION FOR SUMMARY
      JUDGMENT …………………………………………………...............................................10

   II.  QUESTIONS OF DAMAGES AND ATTORNEY'S FEES ARE PREMATURE………21

CONCLUSION………………………………………………………………………………22

# TABLE OF AUTHORITIES

## CASES

United Mine Workers of America v. Gibbs,
383 U.S. 715, 726 (1966) ................................................................................2

Steffenhagen v. Sullivan,
579 Fed.Appx. 32 (2d Cir. 2014)....................................................................3

Matshushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986)................................................................................4

Whitenack v. Armor Medical, Nassau County Correctional Facility, Nassau County, et al.
No. 13-CV-2071 (SJF)(ARL), 2013 WL 2356110 (E.D.N.Y., May 28, 2013........................11

Cornejo v. Bell,
592 F.3d 121,127 (2dCir.2010)...........................................................11

Whitenack v. Armor Medical, NCCC-Sheriff Sposato and Nassau County,
No. 13-CV-2071 (SJF) (ARL), 2014 WL5502300........................................................11

Jones v. Town of E. Haven,
691 F.3d 72, 80 (2d Cir. 2012)...........................................................11

Roe v. City of Waterbury,
542 f.3d 31, 36 (2d Cir. 2008).............................................................11

Connick v. Thompson,
563 U.S. 51, 131 S.Ct. 1350, 1359 (2011)..................................................11

Filarsky v. Delia,
_ U.S. _, 132 S. Ct. 1657, 1661 (2012).................................................12

Feder v. Sposato,
No. 11-CV-193 (JFB), 2014 WL 1801137, *6 (E.D.N.Y., May 27, 2014.............................12

Sykes v. McPhillips,
412 F.Supp.2d 197, 202 (N.D.N.Y. 2006)...........................................................12

Estelle v. Gamble,
429 U.S. 97 (1976)...........................................................................................12

Harrison v. Barkley,
219 f.3d 132, 137  (2d Circ. 2000)....................................................................12

Hathaway v. Coughlin,
37 F.3d 63, 66 (2d Cir. 1994)...........................................................................12

Crook v. Sanchez,
No. CV-13-328 (JFB) (WDW), 2014 WL 7399313, *8 (E.D.N.Y., Feb. 12, 2014).................13

Iacovangelo v. Correctional Medical Care, Inc.,
2015 WL 106 A.D. 5315333 (2d Cir. 2015)...........................................................15

Caiozzo v. Koreman,
581 F.3d 63 (2d Cir. 2009)...............................................................................15

Colon v. County of Nassau,
N. 12-CV-4466 (JS) (SIL), 2014 WL 4904692 (E.D.N.Y., Sept. 26, 2014).................15, 17, 18

Salahuddin v. Goord,
467 f.3d 263, 280 (2d Cir. 2006).......................................................................17

Gonzalez v. New York City Housing Authority,
77 N.Y.2d 663, 667-668 (1991)........................................................................21

Raucci v. Town of Rotterdam,
992 F.3D 1050 (2D Cir. 1990)..........................................................................22

Kroshnyi v. U.S. Pack Courier Services, Inc.,
771 F.3d 93 (2d Cir. 2014)..............................................................................22

Civevert v. Varsity Bus Co., Inc.,
No. 12-CV-1223 (RRM) (VVP), 2014 WL 4690674 at *3 (E.D.N.Y., Sept. 22, 2014)............22

## INTRODUCTION

This memorandum is submitted by Plaintiff Lilyann Ryan [*"Plaintiff"*], in both her individual and representative capacity as Administrator of the estate of her deceased son, Bartholomew Ryan [*"Ryan"*], in opposition to the motions for summary judgment brought by (a) Defendants County of Nassau [*"Nassau County"*], County of Nassau Correctional Center [*"NCCC"*] and Nassau County Sheriff's Office [*"Sheriff's Office"*] and (b) Defendants Armor Correctional Health Services, Inc. and Armor Correctional Health Services of New York, Inc. [*"Armor"*]. Due to the similarity of issues, Plaintiff submits this single, combined memorandum addressing the arguments of both sets of moving parties.

In addition, Plaintiff cross-moves, in the alternative, for the right to amend the Complaint should the Court's decision on the motions for summary judgment deem such amendment necessary or expedient. Fed.R.Civ.P. 15(a)(2).

## PRELIMINARY STATEMENT

In what has become a disturbing exercise on Long Island, yet another plaintiff finds herself before the Court questioning the practices of Defendant Armor in its provision of medical services, for profit, to the inmates of Defendant Nassau County's jail facility, NCCC. As *Newsday* attests in a continuing series of investigative articles, so prevalent have these corporate "lapses" become, "[t]he state attorney general's office has launched an investigation into the medical care contractor [Defendant Armor] for Nassau County's jail [Defendant NCCC], according to sources familiar with the probe." Bridget Murphy, "State Probe At Jail", *Newsday*, October 29, 2015, at Page A4, see Exhibit "A".

With respect to Bartholomew Ryan, a Marine Corps veteran suffering from PTSD who had been treated multiple times at local Veteran's Administration hospitals, his arrest for

driving while under the influence of drugs proved a death sentence when he hung himself in his cell at NCCC. The words of the Final Report of the New York State Commission of Correction are cold: "Bartholomew Ryan was a 32 year old white male who died on 2/24/12 from a suicidal hanging while in the custody of the Nassau County Sheriff at the Nassau County Correctional Center. Ryan suffered [redacted] which he received inadequate evaluation [redacted] and treatment by Armor Correctional Health Care, Inc. (Armor Inc.), a business corporation holding itself out as a medical care provider." (See Exhibit "B", *In the Matter of the Death of Bartholomew Ryan*, Final Report, New York State Commission of Correction, March 19, 2013, paragraph 1).

This action also moves beyond Bartholomew Ryan's individual death to bring into question the deliberate indifference of Defendants Nassau County and Armor to the deceased's safety, security and medical care; an indifference demonstrated time and time again in the deaths of other inmates at NCCC in what is a carefully structured policy of inadequate care which is dictated by something other than medicine. Contrary to Defendants' position, that neither Nassau County nor Armor may be held liable under 42 U.S.C. § 1983, both the law and the facts say otherwise. The deliberate indifference of Armor must now, after so many deaths by suicide at NCCC, be viewed as question of fact for the jury rather than that which can be cured by mere corporate denials.

Finally, at this stage of the proceedings, post-discovery, should the Court grant summary relief dismissing the § 1983 action without the right to amend, it would be appropriate for the Court to retain this matter under its supplemental jurisdiction. 28 U.S.C. § 1367; *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) [Pendent jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present

a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them (internal citation omitted)."]

## THE STANDARD FOR SUMMARY RELIEF

Under Fed.R.Civ.P. 56(c), a motion for summary judgment is considered "construing all evidence in the light most favorable to the non-moving party." *Wiley v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015). Summary judgment may only be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* Stated another way, on a motion for summary judgment, the court must resolve all ambiguities in favor of the party opposing accelerated relief and only grant such relief "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Steffenhagen v. Sullivan*, 579 Fed.Appx. 32 (2d Cir. 2014), citing *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## FACTS NECESSARY TO DECIDE THESE MOTIONS

Mr. Ryan served in the United States Marine Corps from 2003 to 2007. (See paragraph 5 of Defendant Armor's Rule 56.1). Mr. Ryan served a tour of duty in Iraq from DATE TO DATE. (See Exhibit "C", Mr. Ryan's Military Discharge record). From 2009 to the date of his death Mr. Ryan had been diagnosed with Post Traumatic Stress Disorder, depressive disorder NOS, anxiety disorder, depression, traumatic brain injury, major depressive disorder, opiate dependence, opiate abuse and dysthemia. (See paragraph 9 of Plaintiff's Counterstatement to Defendant Armor's Rule 56.1; See also Exhibit "D", Mr. Ryan's Department of Veterans Affairs records and Exhibit "E" Mr. Ryan's Phoenix House records). Mr. Ryan had been treated at 3 Veterans Administration Facilities prior to his death for the above said disorders. Id.

3

Prior to his admission to NCCC Mr. Ryan had expressed suicidal thoughts to multiple health care providers.  (See paragraph 11 of Plaintiff's Statement of Additional Facts in Plaintiff's Counterstatement to Defendant Armor's Rule 56.1, See also Exhibit "M").  According to the October 21, 2008 note of the Northport Veterans Administration, Mr. Ryan expressed suicidal thoughts by responding to the question "thoughts that you would be better off dead or of hurting yourself in some way: more than half the days."  (See Exhibit "F", October 21, 2008 note)  The February 15, 2012 note of the Northport VA, only 9 days before his suicide where in the history section it states suicidal ideations in the past. (See Exhibit "G", February 15, 2012 note).

Not only did Mr. Ryan have an extensive serious psychiatric history he also had a long history of drug abuse which began after he was discharged from the military.  (See paragraph 23 of Plaintiff's Statement of Additional Facts in Plaintiff's Counterstatement to Defendant Armor's Rule 56.1).  In October 2011 Mr. Ryan was admitted to the Phoenix House, a drug and alcohol treatment facility.  (See Defendant Armor Exhibit "D", L. Ryan Tr. , Page 89, Line 22 through Page 91 Line 22).  Mr. Ryan self-discharged himself from Phoenix House on February 6, 2012, 17 days prior to his admission to NCCC.  (See Exhibit "E" Phoenix House records). Further, Mr. Ryan was incarcerated at NCCC due to a drug related offense.  (See Exhibit "H", NCCC records).

On February 23, 2012 Mr. Ryan was admitted to the NCCC.  (See Exhibit "H", NCCC records).  Mr. Ryan's mother did not intend to post bail for Mr. Ryan because she thought it was the safest place for him.  (See Exhibit "N", Paragraph 25 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).

Upon his admission to NCCC, Mr. Ryan had informed the admitting officer that he had

4

attempted suicide in the past and that he had a psychiatric history. (See Exhibit "N", Paragraph 21 and 22 of Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1 and Exhibit "I", Inmate History Information Form). After going through the admission process Mr. Ryan was deemed a suicide risk. (See Paragraph 24 of Defendant Armor's Rule 56.1 and Defendant Armor Exhibit "G", Suicide Prevention Screening Form).

After undergoing the suicide prevention screening, Mr. Ryan was evaluated by LPN Mathews, an employee of defendant Armor who documented that Mr. Ryan was currently taking Symbiax for PTSD. (See Defendant Armor Exhibit "O"). LPN Mathews documented that Mr. Ryan had active mental health conditions and needed to be put in mental health housing and urgent referral to medical. Id.

One hour later, Mr. Ryan was evaluated by RN Tanya Tinglin, an employee of defendant Armor. (See Defendant Armor Exhibit "I" and Defendant Armor Exhibit "H", Tinglin Tr. Page 24, Line 18 through Page 25, Line 22). In this evaluation, Nurse Tinglin documented under significant past medical history that Mr. Ryan suffered from PTSD, bipolar (mania) and anxiety. Id. Under "habits/behaviors" she noted that Mr. Ryan denied alcohol or drug use, which is in complete contrast to what he told the previous nurse. Id. Nurse Tinglin further documented that Mr. Ryan had not received outpatient treatment for "emotional/nervous problems" which again is in complete contrast to the fact that he had previously been diagnosed with PTSD, bipolar disorder and anxiety which was documented by the nurse under chronic health problems. Id. Nurse Tinglin also documented that Mr. Ryan had not received past psychiatric medications, which again is in complete contrast to the previous notes of the correction officer and nurse who both noted that he was currently taking psychiatric medication (Simbiax). Id.

The next day, on February 24, 2012 at 8:52 a.m., Mr. Ryan was seen by Dr. Vincent Manetti, the psychiatrist employed by Armor at NCCC. (See Defendant Armor Exhibit "K").

Dr. Manetti performed an intake screening where he documented that Mr. Ryan had a history of opiate addiction and that he used heroin and OxyContin two (2) days ago however, Dr. Manetti believed that Mr. Ryan had used heroin more recently. (See Defendant Armor Exhibit "K" and Defendant Armor Exhibit "J", Manetti Tri. Page 67, Line 3-22). Dr. Manetti also documented that Mr. Ryan was prescribed Symbiax at Phoenix House. (See Defendant Armor Exhibit "K"). Dr. Manetti diagnosed Mr. Ryan with opiate dependence and referred Mr. Ryan to medical on an "urgent (ASAP)" basis for monitoring or treatment as clinically needed. Id. Dr. Manetti then checked that Mr. Ryan could be sent to general population. Id. Dr. Manetti did not prescribe any medication for Mr. Ryan's mental health or opiate withdrawal. Id. Dr. Manetti stated he was very concerned about that Mr. Ryan could withdraw within hours. (See Paragraph 105 of Defendant Armor's Rule 56.1). Dr. Manetti requested an urgent referral to medical regarding that. (See Paragraph 108 of Defendant Armor's Rule 56.1). According to Dr. Manetti, the guidelines of Armor call for a patient to be seen within 24 hours when an urgent referral is made. (See Defendant Armor Exhibit "J", Manetti Tr. Page 52, Line 5-16).

Although the information that Nurse Mathews, Nurse Tinglin and Dr. Manetti documented were different with regards to Mr. Ryan's appearance and drug and psychiatric history, they never spoke to each other to try and explain the differences. (See Paragraphs 10 and 67 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).

Dr. Manetti never attempted to contact any of Mr. Ryan's treating physicians, his family members or any of the hospitals or institutions which Mr. Ryan had received treatment for his psychiatric and drug problems. (See Exhibit "N", Paragraph 13 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center

Rule 56.1).  Dr. Manetti never asked Mr. Ryan for permission to do so.  (See Defendant Armor Exhibit "J", Manetti Tr., Page 49, Line 16-18).  According to the Nassau County Sheriff's Department Division of Correction Policy and Procedures  Manual regarding the Inmate Admissions Process a physician who examines a patient at the NCCC musty make diligent efforts to contact the inmates physician.  (See Paragraph 5 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).

According to Dr. Manetti, in order to fail the suicide screening test an inmate would have to answer "Yes" to eight (8) questions.  (See Exhibit "K", Manetti Tr., at 71:4-14).  However, Dr. Manetti does not know who determined that those questions asked were the appropriate questions to ask an inmate at the facility.  (See Exhibit "K", Manetti Tr, Page 20, Line 24-Page 22, Line 7).

After this evaluation by Dr. Manetti at 8:52 a.m., Mr. Ryan was never assessed again by a medical provider at NCCC.  (See Paragraph 52 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).

Six hours later, at 2:58 p.m. Mr. Ryan was found hanging in his cell after using three (3) cut pieces from his white bed sheet to create a noose which he tied around his neck and to the bars of the front of his cell.  (See Paragraph 41 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).  Mr. Ryan was not on constant supervision at the time of his suicide.  (See Paragraph 59 of Plaintiff's Statement of Additional Facts in Plaintiff's Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).    At the time of Mr. Ryan's suicide he was considered a new admit to the prison.  People in new admit status are considered a high risk for suicide.  (See

Paragraph 1 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).

An autopsy was performed after his death which revealed the presence of fluoxetine (Prozac), Xanax and alcohol in his blood, proof that Mr. Ryan was taking Symbiax. (See Paragraph 54 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1 and Exhibit "J" copy of the autopsy report).

At the time of his death there was no suicide prevention policy in effect at the NCCC. (See Exhibit "K", Affidavit of Martin Horn). The only policy that has been provided was a Basic Program Trainer's Manual entitled Suicide Prevention and Crisis Intervention. (See Defendant Nassau Exhibit "Q"). On the cover of this handbook it specifically states "This training is intended to be implemented as one component of an overall program which should also, **at a minimum**, include the development of relevant policies and procedures addressing internal corrections or law enforcement operations, as well as coordination with mental health and/or medical services." (emphasis added). Id.

Correction Officer Gross, one of the responding officers to Mr. Ryan's suicide, could not state for certain whether he ever received any suicide awareness or prevention class in the 15 years that he was a correction officer. (See Paragraph 35 of Plaintiff's Statement of Additional Facts in Plaintiff's Counterstatement of Material Facts Rule 56.1 to Nassau County). Correction Officers at the Nassau County Correction Center never received training prior to Mr. Ryan's death about how to deal with inmates who are veterans. (See Paragraph 4 of Plaintiff's Statement of Additional Facts in Plaintiff's Counterstatement to Nassau County Rule 56.1).

Mr. Ryan was not the first inmate to commit suicide at the NCCC. On January 3, 2011 inmate Darryl Woody committed suicide while at the Nassau County Correctional Center. (See

8

Paragraph 26 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).  On January 3, 2010 inmate Eamon McGinn committed suicide while are the Nassau County Correctional Center.  (See Exhibit "N", Paragraph 27 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).  On October 5, 2010 inmate Gasparino Godino committed suicide while at the Nassau County Correctional Center.  (See Paragraph 28 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).  On October 27, 2010 Herve Jeanot committed suicide while at the Nassau County Correctional Facility.  (See Paragraph 29 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).  Following the suicides of Darryl Woody, Eamon McGinn, Gasparino Godino and Herve Jeanot there was no review done by the Nassau County Correctional Center of its suicide policy. (See Paragraph 30 of Plaintiff's Statement of Additional Facts in Plaintiffs Counterstatement to Defendant Nassau County Correctional Center Rule 56.1).

At the time of Mr. Ryan's suicide he was likely going through opioid withdrawal.  (See Exhibit "L", Cohen affidavit, Paragraph 27).  A person going through drug withdrawal is at a higher risk for suicide than a person who is not suffering from drug withdrawal.  (Exhibit "L", Paragraph 19).

Dr. Ziv Cohen states that "Dr. Manetti's decision to transfer Mr. Ryan to the "general population" units in the correctional facility based on his inadequate review of the nursing assessment, his own inadequate history taking, and the inadequate assessment and treatment plan were a clear deviation of the standard of care.  The standard of care required that a patient with Mr. Ryan's psychiatric conditions, current symptoms, and opioid withdrawal be maintained on a constant, 1:1 level of observation, and be vigilantly treated for psychiatric conditions and drug

withdrawal.  If Mr. Ryan had been classified as a constant observation inmate, he would not have had access to the sheets he used to commit suicide and would instead have been given an antisuicide smock and blanket.  He would have been visualized continually, minimizing his ability to harm himself."  Dr. Cohen further opines that Dr. Manetti's decision to sign off on the case by writing "No need for psychotropics or MH [mental health] FU [follow up] at this time" were a clear deviation from the standard of care. Given his concern about opioid withdrawal, it was incumbent on Dr. Manetti to vigilantly follow Mr. Ryan's progress and to treat any signs of opioid withdrawal with the appropriate medications.

As a result of Mr. Ryan's suicide, an investigation was performed by the New York State Commission of Corrections.  (See Exhibit "B")  The findings were that "Bartholomew Ryan was a 32 year old white male who died on 2/24/12 from a suicidal hanging while in the custody of the Nassau County Sheriff at the Nassau County Correctional Center.  Ryan suffered [redacted]  which he received inadequate evaluation [redacted] and treatment by Armor Correctional Health Care, Inc. (Armor Inc.), a business corporation holding itself out as a medical care provider."  (See Exhibit "B", *In the Matter of the Death of Bartholomew Ryan*, Final Report, New York State Commission of Correction, March 19, 2013 paragraph 1).

## ARGUMENT

## POINT I

**THE CLAIMS AGAINST DEFENDANTS
ARE ENTIRELY PROPER UNDER § 1983
AND DEFENDANTS HAVE FAILED TO ELIMINATE
ALL MATERIAL QUESTIONS OF FACT,
THUS JUSTIFYING DENIAL OF THEIR MOTION
FOR SUMMARY JUDGMENT**

"'To state a claim under Section 1983, a plaintiff must allege (1) that the challenged

conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Whitenack v. Armor Medical, Nassau County Correctional Facility, Nassau County, et al.,* No. 13-CV-2071 (SJF) (ARL), 2013 WL 2356110 (E.D.N.Y., May 28, 2013), quoting *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir.2010) (internal citations omitted). However, while a § 1983 claim must allege the personal involvement of an individual defendant, "'a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality'." *Whitenack v. Armor Medical, NCCC-Sheriff Sposato and Nassau County*, No.13-cv-2071 (SJF) (ARL), 2014 WL 5502300 at *7, citing *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012), *cert. den.*, 134 S.Ct. 125 (2014).   To prevail on such a municipality claim under § 1983, the plaintiff must show that the actions were (1) taken under color of law; (2) deprived plaintiff of a constitutional or statutory right; (3) caused his injuries; (4) damaged him in some way; and (5) were an official policy of the municipality.  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

Conceptually, the municipality may be held liable not only for what it does, but what it doesn't do, as well.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Whitenack*, 2014 WL 5502300 at *7, citing *Connick v.Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1359 (2011).  Another concept, just as important here because of the actions/inactions of Defendant Armor and Nassau defendants, is what is commonly called "*Monell* liability."  As held in *Whitenack*, "[a]lthough 'Armor is a private company that provides medical services for inmates at the [NCCC] pursuant to a contract with

11

the Nassau County Sheriff's Department,' [citation omitted], 'anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." *Whitenack*, 2014 WL 5502300 at *8, quoting *Filarsky v. Delia*, __ U.S. __, 132 S.Ct. 1657, 1661 (2012). Because Armor was hired to fulfill Nassau County's constitutional obligation to provide necessary medical for it inmates, Armor was "acting under the color of state law" for purposes of § 1983. *Feder v. Sposato*, No. 11-CV-193 (JFB), 2014 WL 1801137, *6 (E.D.N.Y., May 27, 2014); *Sykes v. McPhillips*, 412 F.Supp.2d 197, 202 (N.D.N.Y. 2006) [medical care workers in a prison are state actors].

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Court held that prison officials are liable under § 1983 for harm incurred by an inmate if the officials acted with "deliberate indifference" to that inmate's safety. *Id.* at 104-105. Such "deliberate indifference" amounts to cruel and unusual punishment under the Eighth Amendment[1] and is defined as knowing that inmates face a substantial risk of harm and disregarding that risk by failing to take reasonable measures to prevent it . *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000).

There are two components to the "deliberate indifference" standard, an "objective" component and a "subjective" component. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). The "objective" component requires that the deprivation must be "sufficiently serious". *Id.* The "subjective" component requires that the official act "with a sufficiently culpable state of mind". *Id.* In order for a plaintiff to sustain a "deliberate indifference" claim, the plaintiff must satisfy

---

[1] The Court has previously noted that the standard is the same for convicted prisoners as well as pre-trial detainees. *Colon v. County of Nassau*, No. 12-CV-4466 (JS) (SIL), 2014 WL 4904692 at *5, fn.4 (E.D.N.Y., Sept. 26, 2014) ["The distinction is irrelevant, however, because '[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.' *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir.2009)."]

both the objective and the subjective parts of the standard. *Feder*, 2014 WL 1801137 at *7.

**A. The fact that Armor is privately owned is meaningless; it operates under the authority of Nassau County and is acting under the color of state law.**

Armor opens its argument contending that it is "privately owned" and its employees are "not state officials" so it cannot suffer any § 1983 claims.  Memorandum of Law in Support of an Order Granting Summary Judgment to Armor Defendants, etc. [*"Armor Mem"*] at 15.   In *Crook v. Sanchez*, No. CV-13-328 (JFB) (WDW), 2014 WL 7399313, *8 (E.D.N.Y., Feb. 12, 2014), Armor "recognize[d] that a deliberate failure to treat a prisoner's serious illness or injury, resulting in the infliction of unnecessary pain and suffering, can rise to the level of a constitutional violation under Section 1983."  To demonstrate that deliberate failure, "a plaintiff must show that (1) he had a sufficiently serious medical need; and (2) the defendant was deliberately indifferent to that medical need." *Id.*

**B. Defendants have failed to demonstrate that their treatment of Bartholomew Ryan did not amount to deliberate indifference to his medical care and safety while Plaintiff has supported that position with evidence sufficient to deny summary judgment.**

If the first prong of a finding of deliberate indifference requires that a plaintiff identify a "serious medical need", then Plaintiff has surely satisfied that requirement.   Prior to his admission to NCCC, Mr. Ryan had been diagnosed with Post Traumatic Stress Disorder, depressive disorder NOS, anxiety disorder, depression, traumatic brain injury, major depressive disorder, opiate dependence, opiate abuse and dysthemia.   (See paragraph 9 of Plaintiff's response to Defendant Armor's Rule 56.1 and Exhibit "D", VA records and Exhibit "E" Phoenix House medical records). At the time of his admission Mr. Ryan had been actively taking Symbiax, a medication prescribed for his psychiatric issues.   Mr. Ryan had told the admitting Correction Officer Archer that he had attempted suicide in the past.   Although CO Archer

13

disputes that fact, the Inmate Admission Form documents otherwise. Further, according to Dr. Ziv Cohen, Mr. Ryan was likely going through drug withdrawal at the time of his suicide. Dr. Manetti agrees with this through his testimony where he stated he believed that Mr. Ryan would go through withdrawal within hours of when he examined him. Mr. Ryan died as a result of Defendants' conduct in denying him the proper level of supervision and psychiatric and drug withdrawal medication.

That conduct was not merely accidental or negligent. Instead it evinced a medical policy of studied and contrived ignorance of inmate's medical, and specifically, psychiatric conditions. In *Feder v. Sposato* the pro se plaintiff claimed that he was deprived of morphine for pain and psychiatric medication for his mental issues. 2014 WL 1801137 at *1. The court granted the defendants in that matter, which included Armor, summary judgment, finding that no rational jury could find that the Armor's employee was "deliberately indifferent" to a serious medical need and that the failure to prescribe morphine for pain did not rise to the level of an Eighth Amendment violation. *Id.* Armor escaped liability because even if its employees failed to prescribe morphine or psychiatric medications, "there is no evidence in the summary judgment record establishing that Armor had a policy or custom that led to those constitutional violations." *Id*

The plaintiff in *Feder*, incarcerated at NCCC, had consulted Armor's Dr. Manetti, the same psychiatrist who refused to prescribe psychiatric or drug withdrawal medication for Bartholomew Ryan and the same psychiatrist who refused to place Ryan on a suicide watch. 2014 WL 1801137 at *2. Though plaintiff averred that Dr. Manetti had the plaintiff's Green Haven Correctional Facility medications file on his desk when the plaintiff treated with Dr. Manetti, Dr. Manetti denied having ever received the file. Instead, Dr. Manetti refused to

prescribe psychiatric medication, causing the plaintiff to suffer panic attacks, hallucinations and be fearful that "he might hurt himself." *Id.* In denying the psychiatric medication, Dr. Manetti relief on the lack of objective signs of any hallucinations or delusions, together with his "diagnostic impression" the plaintiff was malingering. The plaintiff, however, showed that before arriving at NCCC, he had been hospitalized for 3 weeks for serious psychiatric problems. *Id.*

The district court found the first component of the deliberate indifference test satisfied, for it could not determine "as a matter of law" that physical pain and morphine withdrawal were not a serious medical need. *Id.* In fact, the Second Circuit and District Courts within the Circuit have repeatedly held that drug or alcohol withdrawal constitutes an objectively serious medical condition. *See Iacovangelo v. Correctional Medical Care, Inc.,* 2015 WL 5315333 (2nd Cir. 2015); *Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir. 2009).

As to the subjective component, the court found that since the plaintiff was treated for his morphine withdrawal, though perhaps not to his liking, there was no constitutional violation. 2014 WL 1801137 at *11. However, as to Armor's liability for Dr. Manetti's failure to prescribe psychiatric medication, the court briefly noted that it could not find that Dr. Manetti was "acting pursuant to an Armor policy or custom." *Id.*

A few months later, in September 2014, Dr. Manetti and Armor were before this Court in *Colon v. County of Nassau,* No. 12-CV-4466 (JS) (SIL), 2014 WL 4904692 (E.D.N.Y., Sept. 26, 2014), on a motion to dismiss the complaint of a group of pro se plaintiffs under Fed.R.Civ.P. 12(b)(6). Each of the plaintiffs alleged the failure of Nassau County and Armor to provide adequate medical care to plaintiffs while they were housed at NCCC. This time, however, the complaint alleged that the failure to provide medical care was based on Armor's

contract with Nassau County: "According to Plaintiffs, the contract "confines" Armor to a $25 million budget, which covers 'all costs and fees for medications, salaries, supplies, and even community based health care services ... and tests and procedures.' Plaintiffs claim that the contract, because it subjects Armor to a fixed budget, causes Armor 'to cut costs wherever possible' in order to maximize profit, which in turn results in 'sub-standard' healthcare services." *Id.* at *1 (internal citations to pleadings omitted).

In a strangely familiar manner, the *Colon* complaint described a systematic failure by Dr. Manetti to prescribe psychiatric medications to inmates. The reason was not a medical one, however:

> The Complaint makes the following allegations against Dr. Manetti. Dr. Manetti is employed by Armor as a staff psychiatrist at the NCCC. Plaintiffs allege generally that inmates at the NCCC with documented psychiatric history "have been denied psychoactive medication" "based on Armor's strict budget policies." For example, Plaintiff Rodriguez alleges that when he was previously housed at the NCCC, he "was given psych[o]active medication" but that Dr. Manetti later told him "well, since Armor doesn't want to pay for it, I guess you don't need it." Plaintiff Smith similarly alleges that he was denied psychoactive medication "based on Armor's strict budget policies" despite a "well documented 10 year psych history." Based on these allegations, Smith and Rodriguez claim that Dr. Manetti was deliberately indifferent to their medical needs in violation of the Eighth and Fourteenth Amendments and that he committed medical malpractice under New York state law.

*Id.* at *2 (internal citations to pleadings omitted). While Armor's motion to dismiss under Rule 12(b)(6) was unopposed by the plaintiffs in *Colon*, though the Court noted that the "driving force" behind the complaint, a prisoner who had drafted complaints for other prisoners in the past, had been terminated and other prisoners had left no forwarding addresses after departing NCCC. *Id.* at *3.

16

Nonetheless, the Court went on to decide Armor's motion to dismiss.  In doing so

and in discussing the second, or subjective, requirement of deliberate indifference claim, the

Court noted that the mind of the acting official "'need not reach the level of knowing and

purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with

deliberate indifference to inmate health'", adopting the language of the Second Circuit in

*Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006).   The Court continued: "Deliberate

indifference is 'equivalent to subjective recklessness, as the term is used in criminal law.' *Id.*  In

other words, '[t]his mental state requires that the charged official act or fail to act while actually

aware of a substantial risk that serious inmate harm will result.' *Id.* However, 'the risk of harm

must be substantial and the official's actions more than merely negligent.' *Id.*" *Colon,* 2014 WL

4904692 at *5 (internal references back to *Salahuddin,* 467 F.3d at 280.)

Under its deliberate indifference rubric, the Court examined the alleged conduct of

Dr. Manetti, conduct which is suspiciously similar here.  While Armor argued that the complaint

in *Colon* did not "raise plausible inferences that the denial of care was 'sufficiently serious' and

that Dr. Manetti was aware that the denial of medication posed a risk" to plaintiffs' health and

safety", the Court disagreed:

> The Complaint alleges that Rodriguez "was given
> psych[o]active medication" but that Dr. Manetti
> told him "well, since Armor doesn't want to pay for
> it, I guess you don't need it." *If true, the fact that
> Rodriguez was previously treated for a psychiatric
> condition with medication would clearly indicate
> that his condition was serious.* See *Hamm v.
> Hatcher,* No. 05–CV–0503, 2013 WL 71770, at *8
> (S.D.N.Y. Jan. 7, 2013) ("Courts have repeatedly
> held that treatment of a psychiatric or psychological
> condition may present a serious medical need.").
> *Moreover, if Dr. Manetti subsequently denied*

17

> *Rodriguez medication based solely on Armor's budget, and not on actual medical need, Rodriguez could also establish the subjective prong of a deliberate indifference claim.* Smith's allegations, although not as compelling as Rodriguez's, also state a deliberate indifference claim because he alleges that he was denied psychoactive medication despite a "well documented 10 year psych history" "[b]ased on Armor's strict budget policies."

*Colon*, 2014 WL 4904692 at *7 [emphasis added; internal citations to pleadings omitted]. The Court denied Armor's application to dismiss the deliberate indifference claims as against Dr. Manetti. *Id.*

In the case at bar, Mr. Ryan was very likely going through opiate withdrawal at the time of his death and was suffering from serious mental health issues. As discussed previously, plaintiff has shown that Mr. Ryan had a serious medical need when he entered the NCCC and therefore satisfies the first prong of the deliberate indifference standard. With regards to the second prong, the failure of Mr. Ryan to be prescribed any psychiatric or drug withdrawal medication, Dr. Manetti states that he was very, very concerned that Mr. Ryan would go through withdrawal **within hours** and that he requested an **urgent referral** to medical. (Emphasis added). However, according to Dr. Manetti, the guidelines of Armor call for an urgent referral to be seen up to 24 hours later, well in excess of the time he believed that Mr. Ryan would be suffering from withdrawal. (See Manetti Transcript Page 50, Line 9 through Page 52, Line 22). This policy regarding urgent referrals is a policy that caused Mr. Ryan to not be prescribed any psychiatric or drug withdrawal medications. This policy amounts to more than negligence. To have an inmate with serious mental conditions and drug habit to sit in his cell without being seen by a physician for an urgent referral for up to 24 hours is reckless. As such, in this case, there is a policy that was in effect that caused Mr. Ryan to not be prescribed any medication for his drug

18

withdrawal which led to his death.

With regards to Nassau defendants, it has been shown, that at the time of his death there was no suicide prevention policy in effect at the NCCC.  According to the statement located on the front cover of the alleged suicide prevention policies and guidelines, the guidelines given in the admission process did not even reach the minimum standard for a suicide prevention policy.  Martin F. Horn, an expert retained by plaintiff, confirms this in his affidavit which is annexed hereto as Exhibit "K".  Proof of the effect of the failure to have a suicide prevention policy in effect is the four previous suicides at the NCCC within 16 months of Mr. Ryan's suicide.  Again, this is reckless.

The evidence in this case shows that Dr. Manetti, Armor and NCCC have continued to follow a course of conduct leading to the denial of psychiatric and drug withdrawal medication to prisoners incarcerated in the NCCC that come under their care.  That course of conduct stems from the policies of Armor and the failure of NCCC to have a suicide prevention policy in effect.  Such policies, be they policies of action or inaction, support Plaintiff's claim that Armor and Nassau County's deliberate indifference to Bartholomew Ryan's mental and drug problems were a proximate cause of his death by hanging at his own hand; the first by instituting and enacting such policies; the second, by purposefully creating, ignoring and failing to investigate their effects.

**C.  Defendants Armor and Nassau County have failed to eliminate material questions of fact which may only be decided by the actual trier of fact at trial.**

Defendants, seeking the benefit of judgment without trial, have the affirmative duty to demonstrate that there are no material facts which need deciding; that their right to judgment is unassailable; the even were the Court to draw every inference against them and resolve ever ambiguity in Plaintiff's favor, Defendants would still prevail. In prior matters uncannily similar

to this one, Armor and Nassau County have avoided meeting that standard by truncating the inquiry at the pleading level.  However here, in the case of Bartholomew Ryan's death, the questions have now accumulated to the level where they cannot be ignored.

Dr. Manetti's action in refusing to prescribe psychiatric and drug withdrawal medication to Ryan, despite the fact of his prior psychiatric history, his military service causing PTSD, his drug addiction, his candid admission to a Correction Officer employed by Nassau County that he had been suicidal in the past, the failure of Dr. Manetti to inquire of the Veteran's Hospital which had been treating Ryan, the failure of Dr. Manetti to call Ryan's mother to confirm whether the information from this deeply troubled veteran was plausible or true; all reflect on a common scheme or plan on the part of Armor to not seek information it did not want to hear.  Dr. Manetti, who had been tagged in various prior litigations for refusing to prescribe psychiatric medication based on budgetary and profit-based reasons rather than medical ones, acted consistently with his alleged course of conduct.  He refused to prescribe psychiatric medication to Ryan and did not place him on a suicide watch, which would have obviously highlighted the need to do so.  Dr. Manetti saved Armor and Nassau County money at the expense of Ryan's life.

There is nothing in this record from Armor or Nassau County to suggest otherwise; their assurances that documents accomplish that task are merely evidence that such documents are the efficient protocol created by Armor and Nassau County to allow reliance on - - of all things - - the assurances of a mental patient and a drug addict that he is not suicidal, without any independent objective or medical corroboration, in order to justify not prescribing expensive psychiatric medication or a suicide watch level of custodial supervision.

## POINT II

## QUESTIONS OF DAMAGES AND
## ATTORNEY'S FEES ARE PREMATURE

Defendant Armor argues that Plaintiff's pleading 42 U.S.C.§ 1988 as to attorney's fees should be adjudicated at this time on its motion for summary judgment. Armor Mem at 23. As Armor admits, however, attorneys' fees are only available to the prevailing party. *Id.* Consequently, that determination must await trial and is not a matter for summary relief.

The same may be said for Defendant Armor's desire to eliminate the question of wrongful death damages stemming from Bartholomew Ryan's death. Armor Mem at 23. Parsing Armor's language, it believes that under New York law, which awards only damages for pecuniary losses in wrongful death actions, Ryan's life was completely valueless and that the only such damages Plaintiff would be entitled to are "the costs of the funeral and burial . . . which amount to approximately $11,300." *Id.* It would be premature to discuss damages issues on a motion for summary judgment, especially since the record is not fully developed on that issue, nor would one expect it to be. If Armor is correct, it can make its argument at the close of Plaintiff's direct case at trial. The Court should not be enmeshed in questions of what the value of "plaintiff's reasonable expectancy of future assistance or support by decedent" might be or what the "loss of support, voluntary assistance and possible inheritance" are worth at this juncture. *Gonzalez v. New York City Housing Authority*, 77 N.Y.2d 663, 667-668 (1991). Suffice it to say that the opinion of a defendant in this regard might stand in sharp contrast to that of a plaintiff.

Lastly, Armor is incorrect in its determination that the exercise of the Court's supplemental jurisdiction with respect to Plaintiff's state claims would be inappropriate or ill-

21

advised should Defendants prevail on their summary judgment motion as to the claims under federal law. Armor Mem at 24. *Raucci v. Town of Rotterdam*, 902 F.3d 1050 (2d Cir. 1990) [in action presenting state negligence and § 1983 claims, appropriate for district court to retain state claim under pendent jurisdiction after dismissal of § 1983 claims; at time of dismissal discovery completed and dispositive motions decided]; *see also, Kroshnyi v. U.S. Pack Courier Services, Inc.*, 771 F.3d 93 (2d Cir. 2014) [no abuse of discretion to exercise supplemental jurisdiction over state claims where discovery completed, dispositive motions submitted and case soon ready for trial]; *Cinevert v. Varsity Bus Co., Inc.*, No. 12-CV-1223 (RRM) (VVP), 2014 WL 4690674 at *3 (E.D.N.Y., Sept. 22, 2014) [not mandatory to dismiss state claims following federal claim dismissal; discretion with court; court must consider values of judicial economy, convenience, fairness and comity; supplemental jurisdiction exercised as result of extensive pretrial proceedings, including discovery and court's familiarity with facts and issues; remaining state claims neither novel or complex issues of state law].

      Discovery in this case is now virtually complete and dispositive motions are presently before the Court. The Court is not only familiar with the facts, but is fully familiar with the law in this matter as well., in light of dealing with similar issues and parties in the past. Exercising its supplemental jurisdiction will save future, needless litigation in state court.

## CONCLUSION

      Plaintiff requests that the applications before the Court be denied in all respects; in the event that the Court dismisses only the federal action, Plaintiff would ask that the Court retain the state claims under its supplemental jurisdiction; in the event that the Court declines to exercise its supplemental jurisdiction, Plaintiff would ask that the Court allow Plaintiff thirty

(30) days in which to begin a similar state action and that Defendants, their employees and their agents be directed to accept the service of such a state complaint without the interposition of any jurisdictional or statute of limitations defenses whatsoever; together with such other relief as the Court finds appropriate.

Dated: Port Washington, New York
      November 6, 2015

PARKER WAICHMAN LLP
*Attorneys for Plaintiff*
6 Harbor Park Drive
Port Washington, New York 11050
(516) 466-6500

By: _____
Nicholas E. Warywoda [NW-6968]

23