# EXHIBIT K

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LILLYANN RYAN, AS ADMINISTRATOR OF THE
ESTATE OF BARTHOLOMEW RYAN, DECEASED AND
LILLYAN RYAN, INDIVIDUALLY,

        Plaintiffs,

 -against-

COUNTY OF NASSAU, COUNTY OF NASSAU
CORRECTIONAL CENTER, NASSAU COUNTY
SHERIFF'S DEPARTMENT, ARMOR CORRECTIONAL
HEALTH SERVICES, INC., AND ARMOR
CORRECTIONAL HEALTH SERVICES OF NEW YORK,
INC.,

      Defendants.
-----------------------------------------------------------------X

**EXPERT AFFIDAVIT OF MARTIN HORN**

Docket No: 2:12-cv-05343

STATE OF NEW YORK   )
           ) ss:
COUNTY OF NEW YORK  )

  MARTIN HORN, being duly sworn, deposes, says and affirms the truth of the following matters under penalty of perjury:

  1.  I am over the age of 18 years, reside in the State of New York, and am not a party to this action.

  2.  I served as Commissioner of the New York City Department of Probation, effective Jan.1, 2002. A year later Mayor Bloomberg appointed me to simultaneously serve as Commissioner of the New York City Department of Correction, the City's jail system, and I held both positions simultaneously until July 31, 2009. I served, from March 1995 until January 2000, as Pennsylvania's Secretary of Corrections. I served as co-chair of the American Bar Association Corrections Committee and chaired the policy and resolutions committees of both the American Correctional Association and the Association of State Corrections Administrators. I served as a Commissioner of the Commission on Accreditation for Corrections and am a member of the Psychiatric Advisory Board of the New York State Commission on Quality of Care for Persons with Disabilities established by the State's Special Housing Unit Exclusion Law. I have written published articles and delivered addresses to professional

meetings throughout my career. I have testified on behalf of government agencies in both State and Federal Courts and have been an expert in both State and Federal litigation. I have attached my curriculum vitae.

3. By virtue of my professional education, training, certifications and experience as a Corrections Commissioner, I have expertise in all aspects of prison practices.

4. I was contacted by Parker Waichman LLP and asked to render an opinion in this matter to provide expert opinion as to the administration of the Nassau County Correctional Center and the administration of mental health services and suicide prevention to inmates in custody in that jail by Armor Correctional Health Services at the time of the suicide of inmate Bartholomew Ryan on February 24, 2012.

5. As part of my analysis, I have reviewed numerous materials in connection with this case, including:

o Summons and Complaint
o Amended Summons and Complaint
o Medical Records of Armor Correctional Health Services
o Final Report of the New York State Commission on Correction
o Defendant County of Nassau Rule 26 Disclosure
o Records from the Nassau County Police Department
o Defendant Armor's Interrogatory Responses
o Defendant Armor's Response to Plaintiff's Request for Documents
o Defendant County of Nassau's Response to Plaintiff's Request for Documents
o Deposition transcript Dr Vincent Manetti
o Deposition transcript Lt. Delahunty
o Deposition transcript CO Thomas Killeen
o Deposition transcript CO Michael Archer
o Deposition transcript CO William Smith
o Deposition transcript CO Steven Brown
o Deposition transcript CO Joseph Gross
o Deposition transcript CO Patrick Graba
o Deposition transcript Nurse Tanya Tinglin,
o Deposition transcript Nurse Natalie McPherson
o Performance-Based Standards for Adult Local Correctional Facilities, 4th ed. American Correctional Association, 2004
o Standards for Health Services in Jails, National Commission on Correctional Health Care, 2003
o City of New York, Mayors Management Report 2002-2010
o *Understanding Suicide Prevention in Correctional Facilities*, National Center on Institutions and Alternatives, July 12, 2004
o Suicide Prevention in Custody, American Correctional Association, 1991
o Prison Suicide: An Overview and Guide to Prevention, U.S. Department of Justice, National Institute of Corrections June, 1995

o Laws of New York, Corrections Law
o 9 NYCRR 7000 et. seq
o New York State Commission of Correction website http://www.scoc.ny.gov/index.htm

6. The opinions stated below do not encompass all the opinions I hold in this matter but are limited to statements to respond to defendant Rule 56.1 statement of undisputed facts.

7. County of Nassau Correctional Center is a jail established pursuant law and governed by relevant sections of New York law (COR Article 20) and Regulations (9 NYCRR AA/A 7000 et seq.).

8. New York COR Law 500-b (7)(a) requires that (underlining added):

(a) Consistent with the commission's rules and regulations
regarding the assignment of inmates to housing units, the chief administrative officer shall exercise good judgment and discretion and shall take all reasonable steps to ensure that the assignment of persons to facility housing units:
(1) fosters the safety, security and good order of the jail; and 4 (2) affords appropriate precautions for the personal safety and welfare of persons in custody with particular attention to those who are known to be vulnerable to assault or any physical or mental abuse.
(b) The chief administrative officer shall consider the following in
Complying with this subdivision:
(1) prior victimization in jail or prison;
(2) prior history of mental illness;
(3) prior history of sex offenses;
(4) prior history of a hostile relationship with another inmate;
(5) prior attempts at self-injury or suicide;
(6) prior attempted escapes;
(7) any mental or physical handicapping condition; and
(8) any other information concerning the safety or welfare of the
inmate.
(c) In considering the above information, the chief administrative officer shall examine the following:
(1) records made available to such officer at the time of the commitment by the court or law enforcement agency;
(2) determinations made upon an interview with an inmate at the time
of classification;
(3) records, to the extent relevant and known to the chief administrative officer, maintained by the department of corrections and community supervision and/or any local correctional facility in this state and which are accessible and available to the chief administrative officer; and
(4) any other relevant information brought to the attention of the chief administrative officer by any person with knowledge of the conditions of the defendant.

9. In a "Chairman's Memorandum" from the New York State Commission of Correction dated February 1, 2011 that Body notified all local correctional facilities within the

Case 2:12-cv-05343-JS-SIL   Document 58-12   Filed 11/06/15   Page 5 of 8 PageID #: 2991

State of New York of a "troubling increase in the rate of inmate suicide. The Board advised the correctional facilities steps to take to reduce the rate of inmate suicide. The Memorandum reiterated advice from prior similar bulletins including 10-2007 advising local correctional facilities to have:

• policy and procedure guidelines to clarify roles of county jail, police department lockup and mental health agency personnel,

• supervision-constant observation of high risk prisoners, training which integrates roles and functions of local law enforcement and mental health staff,

• and critical incident review of prisoner suicide attempts and deaths.

10. Commission's regulations § 7003.2(h) sets forth three levels of supervision beyond "general supervision" (defined in the section as the availability to prisoners of facility staff responsible for the care and custody of such prisoners which shall include supervisory visits conducted at 30-minute intervals. Those additional three levels are:

• "more frequent supervisory visits"
• "active supervision when only general supervision is required, and
• "constant supervision"

11. The "Chairman's Memorandum" emphatically states that "Supervisory intervals of 5-15 minutes are not adequate as a suicide prevention precaution." And it further emphasizes that "if the objective is to prevent suicide **ONLY CONSTANT SUPERVISION IS EFFECTIVE.**" (Emphasis in the original)

12. In the regulations §7003.2 "Constant Supervision" is defined as:

(d) *Constant supervision* shall mean the uninterrupted personal visual observation of prisoners by facility staff responsible for the care and custody of such prisoners without the aid of any electrical or mechanical surveillance devices. Facility staff shall provide continuous and direct supervision by permanently occupying an established post in close proximity to the prisoners under supervision which shall provide staff with:

(1) a continuous clear view of all prisoners under supervision; and

(2) the ability to immediately and directly intervene in response to situations or behavior observed which threaten the health or safety of prisoners or the good order of the facility.

13. Mr. Ryan was not on constant supervision or suicide watch at the time of his death.

14. The Standards for Adult Local Correctional Facilities of the Commission on Accreditation for Corrections of the American Correctional Association (4-ALDF-4C-32) requires as a mandatory standard:

**"A suicide prevention program is approved by the health authority and reviewed by the facility or program administrator. It includes specific procedures for handling intake, screening, identifying, and supervising of a suicide-prone inmate and is signed and reviewed annually…It ensures a review of critical incidents by administration, security, and health services. All staff with responsibility for inmate supervision are trained on an annual basis in the implementation of the program. Training includes but is not limited to: (partial listing included herein)**

• **Responding to suicidal and depressed inmates**

• **Communicating between correctional and health care personnel**

15. To the extent it exists, the only policy this observer can find addressing suicide prevention at the Nassau County Correctional Center is Policy and Procedure CD 09-01 dated June 22, 2007 and entitled Inmate Admissions Process. This collection of procedural instruction does not meet the barest requirements of a suicide prevention policy. Rather it is merely a set of procedural instructions. It does not address elements of communication, coordination and it fails to provide for joint training of mental health and custodial staff as it should. It fails to meet the requirements of the most widely accepted Standards within the profession, those of the Commission on Accreditation for Corrections or those of the National Commission on Correctional Health Care and the admonition of the SCOC roles and functions of law enforcement and mental health staff be integrated.

16. It is well documented that heroin withdrawal can be a precipitating factor in jail suicides and that heroin withdrawal should be medically supervised. It was a departure from good and accepted correctional practice not to order suicide watch and medical supervision for Mr. Ryan. Medical supervision of an inmate going through heroin withdrawal includes both examinations and the prescribing of appropriate medication to treat withdrawal symptoms. That was not done for Mr. Ryan.

17. Ryan was placed in the B2 Unit, and he was isolated from other prisoners. This was poor practice and should not have been done. Isolation is not good for suicidal inmates. It escalates their sense of alienation and removes them from human interaction and proper staff supervision. Suicidal inmates should be placed in general population, a congregate mental health unit or medical infirmary with high levels of staff observation and interaction.

18. Killeen also attests in his deposition that he had received no training about when, whether and how to communicate with inmates in the mental observation unit. Neither was he ever told why Ryan was in the unit, that he might be suicidal. This was a departure from good and accepted correctional practice. The duty to warn principle requires that mental health professionals convey information about the suicide risk of a prisoner to the custodial staff should be maximized. Neither Killeen nor any of the other officers indicated that they were trained to interact with the prisoners on B2. Communication between prisoners and officers is critical as it is one of the most important ways an officer can determine how the inmate is changing.

19. Moreover, as the SCOC Chairman's Memorandum makes clear the Sheriff of Chief Administrative Officer has an independent and non-waive able duty to make an independent judgment and is not bound by Manetti's recommendation. The Sheriff should have continued Ryan on suicide watch based upon the information known to him and his staff.

20. According to CO Killeen, B2 unit is for constant observation. It is clear from the depositions of the Correction Officers that Ryan was never on continuous observation

as defined and required by SCOC minimum standards. the differing accounts of levels of supervision offered by Killeen, Archer, Smith, Brown, Gross and Graba that the officers lack a common understanding of what is required and of the difference between constant observation, general supervision, active supervision and more frequent supervisory visits are. Moreover, there is ample evidence from the depositions of these officers that there was no consistent training offered and they were never instructed whether and when to interact with suicidal inmates.

21. In my professional opinion, all of the above demonstrates negligence and deliberate indifference by NCCC and Armor Correctional Health to their responsibilities as a provider of jail mental health care to prevent inmate suicide. This indifference and failure to implement an adequate suicide prevention program on the part of NCCC and Armor was a departure from good and accepted correctional practice and was a proximate cause of Bartholomew Ryan's death by suicide on February 24, 2012.

Dated: New York, New York
February 18, 2015

Martin F. Horn