# EXHIBIT M

UNITED STATES DISTRICT COURT EASTERN
DISTRICT OF NEW YORK
------------------------------------------------------------------X
LILYANN RYAN, as Administrator of the Estate of
BARTHOLOMEW RYAN, deceased and
LILYANN RYAN, individually,

                Plaintiff,                         Index No. 12-CV-05343

                                                (JS) (SIL)

        - against -                     COUNTER-STATEMENT OF
                                        MATERIAL FACTS
                                        PURSUANT TO LOCAL RULE 56.1

COUNTY OF NASSAU, COUNTY OF NASSAU
CORRECTIONAL CENTER, NASSAU COUNTY
SHERIFF'S DEPARTMENT, ARMOR CORRECTIONAL
HEALTH SERVICES, INC. and ARMOR
CORRECTIONAL HEALTH SERVICES OF NEW
YORK, INC.,

                Defendants.
------------------------------------------------------------X

      Pursuant to Local Pursuant to Local Rule 56.1, Plaintiff, LILYANN RYAN, as Administrator

of the Estate of BARTHOLOMEW RYAN, deceased, and LILYANN RYAN, individually, by her

attorneys, submits the following counter-statement of material facts in response to Defendants THE

COUNTY OF NASSAU, COUNTY OF NASSAU CORRECTIONAL CENTER, and NASSAU

COUNTY SHERIFF'S DEPARTMENT (hereinafter the "County Defendants"):

     1.          Undisputed.

     2.          Undisputed.

     3.          Undisputed.

     4.          The complaint in the action speaks for itself.

     5.          Undisputed.

     6.          Undisputed.

     7.          Undisputed.

8.      Undisputed.

9.      Undisputed.

10.     Undisputed.

### REFERENCES

11.     Plaintiff's Summons and Complaint (Complaint). (See Complaint attached to Scott declaration as Exhibit "A".)

12.     Plaintiff's Amended Summons and Complaint (Amended Complaint are attached to Scott declaration as Exhibit "B".)

13.     The Answer to the Amended Complaint by the Defendant County of Nassau. (See Answer attached to Scott declaration as Exhibit "C".)

14.     The Answer to the Amended Complaint by Armor. (See Answer attached to Scott declaration as Exhibit D".)

15.     "Ryan 50-H Tr." refers to the transcript of the 50-H Hearing of Plaintiff Lilyann Ryan conducted on August 12, 2012. (See Ryan 50-H Tr. attached to Scott declaration as Exhibit "E".)

16.     "Ryan deposition Tr." refers to the transcript of the deposition of Plaintiff Lilyann Ryan conducted on August 16, 2012. (See Ryan deposition Tr. attached to Scott declaration as Exhibit "F".)

17.     "Archer Tr." refers to the transcript of retired Nassau County Correction Officer Michael Archer (Hereinafter "Archer") conducted on May 19, 2014. (See Archer Tr. attached to Scott declaration as Exhibit "G".)

18.     "Tinglin Tr." Refers to the transcript of Armor employee Tanya Tinglin

(Hereinafter "Tinglin") taken August 8, 2014. (See Tinglin Tr. Attached to Scott Declaration as Exhibit "U".

19.      "Manetti Tr." refers to the transcript of Armor employee Dr. Vincent Manetti (Hereinafter "Manetti") taken on May 22, 2014. (See Manetti Tr. attached as Exhibit "I" to Scott Declaration).

20.      "Killeen Tr." refers to the transcript of Nassau County Correction Officer Thomas Kileen (Hereinafter "Kileen") conducted on May 19, 2014. (See Kileen Tr. attached to Scott declaration as Exhibit "J".)

21.      "Brown Tr. refers to the transcript of Nassau County Correction Officer Stephen Brown (Hereinafter "Brown") taken on August 5, 2014.  (See Brown Tr. attached to Scott Declaration as Exhibit "K")

22.      "Graba Tr. refers to the transcript of Nassau County Correction Officer Patrick Graba (Hereinafter Graba) taken on June 4, 2014. (See Graba Tr. attached to Scott Declaration as Exhibit "L")

23.      "R. Vogt Tr. refers to the transcript of Nassau County Correction Officer Robert. Vogt (Hereinafter :R. Vogt") taken on June 4, 2014 (See R. Vogt Tr. attached to Scott Declaration as Exhibit "M")

24.      Exhibit "N" is the Correctional Center Suicide Prevention Screening Guidelines and a blank copy is also annexed as Exhibit "N" 1 to show the shaded areas.

25.      Exhibit "O" is the Inmate History Form.

26.      Exhibit "P" is the Correctional Center Standard Operating Policy for Inmate Admission Process.

27.      Exhibit "Q" is the Suicide Prevention and Crisis Intervention in County Jails and Police Lockup Basic Program Trainer's Manual, Exhibit "R" are the Armor Medical records marked at the deposition of Armor employee Tanya Tinglin.

28.      Exhibit "S" are the Armor Medical records marked at the deposition of Armor employee Dr. Vincent Manetti.

29.      Exhibit "T" is a photograph of jail cells on B 2 A tier at the Nassau County Correctional Center.

30.      Exhibit "U" is a photograph of jail cells on B 2 A tier at the Nassau County Correctional Center.

31.      Exhibit "V" is a photograph of cell 2 on B 2 A tier at the Nassau County Correctional Center.

32.      Exhibit "W" is the punch log for key station punches for B 2 A t tier at the Nassau County Correctional Center.

33.      Exhibit "X" is the Correctional Center Patrol log book for A and B blocks.

34.      Exhibit "Y" is the Correctional Center Patrol log book for the lobby area of the tier.

35.      Exhibit "Z" is the Correctional Center Patrol log book for A block.

36.      Exhibit "AA" is the Post Order for B Building 2ND Floor.

37.      "McPherson TR. refers to the transcript of Armor employee Natalie McPherson (Hereinafter "McPherson" taken on August 8, 2014.   (See McPherson Tr. Attached to Scott Declaration as Exhibit "BB")

38.      Undisputed.

39.     This fact is in dispute.  Dispute that every year Archer took an 8 hour course on suicide prevention and what signs of suicide to look for in an inmate.  Refuted by J. Gross Tr. (Exhibit "1" of Warywoda Declaration) Page 13, Line 7 through Line 22.  Admit all other facts alleged.

40.     This fact is in dispute.   Dispute that Archer was not required to note the particular medications Bart was taking.  Refuted by the Suicide Screening Form (Exhibit "N" of Scott Declaration) which states after question 6 (note current psychotropic medications and name of most recent treatment agency).  Dispute that Bart answered "no" to having a history of drug or alcohol abuse.  This is hearsay and is not admissible.  Do not dispute that the form completed by Archer states no for the question had a history of drug or alcohol abuse.  Admit all other facts alleged.

41.     This fact is in dispute.  Dispute that Bart calmed down after his telephone call. This is refuted by the Mental Health Screening form completed by Joe W/ Mathews, LPN (Exhibit "R" of Scott Declaration) where he notes Mr. Ryan to show signs of depression with a flat affect at 2:55 on February 23, 2012 which was after Mr. Ryan's phone call.

42.     This fact is in dispute. Refuted by Archer Tr. (Exhibit "G" of Scott Declaration) Page 54, Line 22 through Page 55, Line 13. The Suicide Prevention Manual that Archer received at the in-service training on suicide prevention is not given to him.  They are given it during the class and they do not take it with them when they leave the class.  Also dispute that the Suicide Prevention class is given every year.  Refuted by J. Gross Tr. (Exhibit "1" of Warywoda Declaration) Page 13, Line 7 through Page 14, Line 4.

## ARMOR EMPLOYEE TANYA TINGLIN

43.     This fact is in dispute.  Dispute that Tinglin reviewed all the documents that were marked as Exhibit "R".  Refuted by Tinglin deposition (Exhibit "H" of Scott Declaration Page 32, Line 12 through Page 33, Line 2.

44.     This fact is in dispute.  The evidence cited to support the alleged fact that Nurse Mathews did not find Ryan to be a suicide risk does not support the fact asserted.  This is refuted by Question 1 of the form which states "Does officer believe inmate may be a suicide risk?"  That refers to the transporting officer not to Nurse Mathews.  Further dispute that the only way an inmate is sent for an immediate referral for suicide watch is if a total of eight boxes being checked Yes.  Refuted by Manetti Tr., Exhibit "I" of Scott Declaration P.22 Line 18-23 and Page 23, Line 2-10

45.     This fact is in dispute.  Dispute that there were no indicators on the mental health assessment that Bart was a suicide risk.  Defendant doesn't cite to anything to support this alleged fact. Refuted by the affidavit of Dr. Ziv Cohen.  Dispute that if Bart needed to be seen urgently by mental health, he would be seen by them immediately.  Refuted by Manetti Tr. Exhibit "I" of Scott Declaration, Page 51, Line 46-Page 52, Line 16 where he states an urgent referral means within 24 hours.  Dispute that a routine referral can mean the inmate will see mental health that night or early next morning.  Refuted by Manetti Tr. by Manetti Tr. Exhibit "I" of Scott Declaration, Page 51, Line 46-Page 52, Line 16 where he states a routine referral means within 48 hours.

46.     This fact is in dispute.  Dispute that Bart did not need any mental health follow up at this point.  This is refuted by the affidavit of Dr. Ziv Cohen.  Dispute that Bart was fine

with being moved to general population.  This statement is hearsay and is not admissible.

47.     Undisputed.

48.     This fact is in dispute.  Dispute that Dr. Manetti gives lectures and presentations at the Sherriff's Training Academy to Correction Officers every year or year and a half on psychiatry and in particular suicide risks to inmates.  Refuted by J. Gross Tr. (Exhibit "1" Warywoda Declaration) Page 13, Line 7-22 and by Manetti Tr. (Exhibit "I" Scott Declaration) Page 20, Line 11 through Line 23.

49.     Undisputed.

50.     Undisputed.

51.     Undisputed.

52.     Undisputed.

53.     This fact is in dispute.  Dispute that Killeen received suicide prevention training in the academy and that Kileen knew what to look for.  The cited material does not support this alleged fact.  Dispute that Kileen was not sure about how much time elapsed from when he last saw Bart before he walked and saw him handing in his cell but he believes it was two to three minutes. Refuted by R. Vogt Tr. (Exhibit "M" of Scott Declaration, Page 47, Line 4-15 where he states conversation with other inmate was approximately 2-3 minutes so time last saw had to be more than 2-3 minutes.  Further it cannot be a fact when he says he is not sure about how much time elapsed.

54.     Undisputed.

55.     Undisputed.

56.     Undisputed.

57.     Undisputed.

58.     This fact is in dispute.  Dispute that the officer assigned to A block has his eyes on the inmates, walking back and forth, conversing, engaging the inmates verbally.  The cited reference does not support the alleged fact.  The cited reference states what an officer is supposed to be doing not what was being done on this date.  Dispute that if an officer notices something is changing in an inmate that mental health will be called and either the doctor will come see the inmate or the inmate will be taken to medical to be assessed by the doctor. The cited reference does not support this assertion.  This states what they are supposed to do not what they actually do.  Dispute that the officers assigned to A block engages the inmates verbally.  Refuted by the R. Vogt Tr., (Exhibit "M" of Scott Declaration) Page 36, Line 5-10 and S. Brown Tr. (Exhibit "K" Scott Declaration, Page 22, Line 12-20).  Dispute that officer an A block is engaged in constant supervision of inmates while he walks on the guard walk. Refuted by Manetti Tr. (Exhibit "I" of Scott Declaration) Page 41, Line 5-16 and Horn Affidavit (Exhibit "2" of Warywoda Declaration).

59.     This fact is in dispute.  Dispute that the signs to look for in a suicidal inmate is limited to an inmate who becomes withdrawn during your tour, stops eating, gives his food and personal items away, tells an inmate or the officer that he wants to harm himself, talking to himself, walking around in an agitated state.   Refuted by the Suicide Prevention and Crisis Intervention Manual, Officers Handbook Section marked as Exhibit which adds other signs of suicide not mentioned by Officer Graba.  (Exhibit "Q" of Scott Declaration).  Also dispute the alleged fact that that the in-service annual training for 3 days that includes mental health issues. The evidence referenced does not support the alleged fact.  Refuted by J. Gross Tr. (Exhibit "1"

of Warywoda Declaration) Page 13, Line 7-22 who states there is no annual training on mental health issues.

60.     This fact is in dispute. Refuted by the procedure manual that defines general supervision and active supervision. Also refuted by the Horn affidavit (Exhibit "2" of Warywoda Declaration).

61.     Undisputed.

62.     This fact is in dispute. Refuted by the statement of Nurse Sandra Jones, LPN (Exhibit "3" of Warywoda Declaration) where she states the AED shocked Mr. Ryan.

63.     This fact is in dispute. The cited evidence does not support the alleged fact that he walked the tiers every fifteen minutes checking on the inmates, see how they are doing, answering questions, making sure they are not hurting themselves or each other. The cited reference states what he is supposed to be doing not what he was doing on this date. Also dispute that he saw Bart every fifteen minutes but does not recall Bart doing anything out of the ordinary. This is refuted by R. Vogt Tr. (Exhibit "M" of Scott Declaration) Page 47, Line 4 through Line 15.

64.     This fact is in dispute. The alleged fact that "Just before the suicide, R. Vogt was doing his patrol, stopped near 11 cell where there was a two to three minute conversation between Killeen and the inmate in 11 cell." The cited evidence does not support the alleged fact that R. Vogt was doing his patrol "just before the suicide". There is no dispute as to the other facts alleged.

65.     Undisputed.

## STATEMENT OF ADDITIONAL FACTS

1.      People in new admit status are considered a high risk for suicide.  (See Exhibit "K" of Scott Declaration, S. Brown Tr., Page 20, Line 14 through Line 23).

2.      Other than Mr. Ryan being told he needed to go see Dr. Manetti, none of the correction officers assigned to the tier where Mr. Ryan was being held ever spoke to him.  (See Exhibit "K" of Scott Declaration, S. Brown Tr. Page 22, Line 12 through Line 20).

3.      Correction Officers at the Nassau County Correctional Facility are not told why an inmate is on the mental observation unit.  (See Exhibit "K" of Scott Declaration, S. Brown Tr., Page 24, Line 14 through 17 and Exhibit "4" of Warywoda declaration, B. Delahunty Tr.,  Page 23 Line 13-17).

4.      Corrections Officers at the Nassau County Correction Center never received training prior to Mr. Ryan's death about how to deal with inmates who are veterans.  (See Exhibit "K" of Scott Declaration, S. Brown Tr., Page 37, Line23 through Page 38, Line 11).

5.      The physician who examines a patient at the NCCC must make diligent efforts to contact the inmates treating physician.  (See Exhibit "P" off Scott Declaration, Nassau County Sheriff's Department Division of Correction Policy and Procedures Manual regarding Inmate Admission Process Page 13, Paragraph 4).

6.      Mr. Ryan stated to Nurse Mathews that that he had last taken Symbiax on February 23, 2012.  (See Exhibit "R" of Scott Declaration, Intake Health Screening Form completed by Nurse Mathews).

7.      Mr. Ryan told CO Archer that he was currently taking Symbiax.  (See

Exhibit "O" of Scott Declaration, Inmate History Information form).

8.     Mr. Ryan told Nurse Tinglin that he was currently taking medications for PTSD, bipolar and depression. (See Exhibit "R" of Scott Declaration, Nurse Tinglin Records).

9.     Dr. Manetti did not prescribe Mr. Ryan Depakote. (See Exhibit "R" of Scott Declaration, Manetti Initial Mental Health Evaluation)

10.    Dr. Manetti did not speak to Nurse Mathews or Nurse Tinglin to discuss the differences in information that each one recorded for history of alcohol or drug use and their observations as to mental status.   (See Exhibit "H" of Scott Declaration, Tinglin Tr., Page 55, Line 13-16).

11.    Dr. Manetti did not record that Mr. Ryan had a history of PTSD, bipolar disorder or anxiety. (See Exhibit "R" of Scott Declaration, Initial Mental Health Evaluation form of Dr. Manetti).

12.    Dr. Manetti did not continue Mr. Ryan's prescription for Symbiax. (See Exhibit "R" of Scott Declaration, Initial Mental Health Evaluation form of Dr. Manetti).

13.    Dr. Manetti did not contact Lilyann Ryan at any time from the time Mr. Ryan was admitted to the Nassau County Correctional Center until his death. (L. Ryan Tr., Page

14.    Mr. Ryan was not prescribed any medication for opioid withdrawal while he was an inmate at the Nassau County Correctional Center.  (See Exhibit "R" of Scott Declaration, Initial Mental Health Evaluation form of Dr. Manetti).

15.    Mr. Ryan was very likely going through opioid withdrawal at the time of his suicide. (See Exhibit "5" of Warywoda Declaration, Affirmation of Dr. Ziv Cohen).

16.      Bart Ryan received drug and psychological evaluation, counseling and treatment at the three (3) Veterans Administration facilities.  (See Exhibit "2" of Warywoda Declaration, Brooklyn Veterans Administration Records; Exhibit "1" of Warywoda Declaration, Northport Veterans Administration Records; and Exhibit "3" of Warywoda Declaration, Montrose Veterans Administration Records).

17.      Prior to his admission to the Nassau County Correctional Center Mr. Ryan received treatment for opiate withdrawal.  (Exhibit "2" of Warywoda Declaration, Brooklyn Veterans Administration Records where Mr. Ryan was admitted from June 20, 2008 to July 11, 2008; Exhibit "4" of Warywoda Declaration, Phoenix House records; Exhibit "3" of Warywoda Declaration, Montrose VA Medical Records; Exhibit "9" of Warywoda Declaration, Nassau County Medical Center Records for November 7, 2009 through November 12, 2009).

18.      Prior to his admission to the Nassau County Correctional Center Mr. Ryan was evaluated, diagnosed and received treatment for Post Traumatic Stress Disorder, depressive disorder NOS, anxiety disorder, depression, traumatic brain injury, major depressive disorder; opiate dependence; opiate abuse and dysthemia. (Exhibit "2" of Warywoda Declaration, Brooklyn Veterans Administration Records where Mr. Ryan was admitted from June 20, 2008 to July 11, 2008; Exhibit "4" of Warywoda Declaration, Phoenix House records; Exhibit "3" of Warywoda Declaration, Montrose VA Medical Records; and Exhibit "9" of Warywoda Declaration, Nassau County Medical Center Records for November 7, 2009 through November 12, 2009).

19.     According to the October 21, 2008 note in the Northport VA Medical Center records, Mr. Ryan expressed suicidal thoughts by responding to the question "thoughts that you would be better off dead or of hurting yourself in some way: more than half the days." (See Exhibit "1" of Warywoda Declaration).

20.     According to the February 15, 2012 note from Northport VA medical center records (Exhibit "1" of Warywoda Declaration) it notes that Mr. Ryan had suicidal ideations in the past.

21.     According to the Inmate History Information form it states "Attempt Suicide:Y". (See Plaintiff's Exhibit "2" on May 19, 2014).

22.     Mr. Ryan told CO Archer that he had attempted suicide in the past. (Inmate History Information form Marked as Exhibit 2"on May 19, 2014 and the testimony of William Smith Page 35, Line 3 through Line 24; Page 38, Line 15 through Page 40, Line 16 and Page 45, Line 20 through Page 46, Line 6.

23.     Bart Ryan had a long history of drug abuse which began after he was discharged from the military. (Exhibit "2" of Warywoda Declaration, Brooklyn VA records).

24.     Pursuant to the Inmate History Form which was marked as Exhibit 2 on May 19, 2014 deposition which was filled out by CO Archer, Mr. Ryan was deemed a suicide risk after he went through the admissions process at the jail. (Inmate History Form which was marked as Exhibit 2 on May 19, 2014).

25.     Lilyann Ryan did not intend to bail plaintiff out of NCCC because she thought it was one of the safest places he could be until a bed became available again at Holliswood, which was a psychiatric treatment facility. (L. Ryan Tr. Page 110, Line 2

through Page 111, Line 6).

26.     On January 3, 2011 inmate Darryl Woody committed suicide while at the Nassau County Correctional Center.

27.     On January 3, 2010 inmate Eamon McGinn committed suicide while are the Nassau County Correctional Center.

28.     On October 5, 2010 inmate Gasparino Godino committed suicide while at the Nassau County Correctional Center.

29.     On October 27, 2010 Herve Jeanot committed suicide while at the Nassau County Correctional Facility.

30.     Following the suicides of Darryl Woody, Eamon McGinn, Gasparino Godino and Herve Jeanot there was no review done by the Nassau County Correctional Center of its suicide policy.

31.     Inmates in new admit status are at a higher risk for suicide than people who are in the general population. (Brown Tr., Page 20, Line 14 -23).

32.     Correction Officers at the Nassau County Correction Center are not told why an inmate is in the mental observation unit. (Brown Tr., Page 24, Line 5-17).

33.     The Correction Officers who were assigned to the mental health tier where Mr. Ryan was housed were never told that Mr. Ryan had been previously diagnosed with mental health issues. (Brown Tr., Page 25, Line 12-16).

34.     An ambulance was not called for Mr. Ryan until approximately 3:23 p.m. (Joseph Gross Tr., Page 41 Line 7 through Page 43, Line 8).

35.     CO Gross could not say for certain that he ever received any suicide

awareness or prevention class in the 15 years that he was a correction officer. (Gross Tr., Page 19, Line 14-17)

36.     Before working for Armor Nurse Tinglin never worked with a patient who suffered from PTSD. (Tinglin Tr., Page 11, Line 8 – 12).

37.     Increased blood pressure is a sign of drug withdrawal. (Tinglin Tr., Page 14, Line 13-15).

38.     None of the Correction Officers at NCCC carried a 911 tool on them on February 24, 2012.

39.     There was no policy in effect on February 24, 2012 at NCCC specifying by whom and on what basis an inmate placed on suicide watch is to be removed from suicide watch.

40.     The Suicide Prevention and Crisis Intervention Basic Program Trainer's Manual marked as Plaintiff's Exhibit 6 on May 19, 2014 was intended to be implemented as one component of an overall program of suicide prevention. (Language from cover of said manual).

41.     There was no change in the suicide prevention policy at the NCCC after any of the suicides that occurred in 2010 or 2011. (Suicide Prevention Manual dated 2003)

42.     Mr. Ryan hung himself by tying his bed sheet around the outside bars of his cell.

43.     Mr. Ryan was not assessed by a psychiatrist until the day after he was admitted into the NCCC. (Manetti note of his evaluation of Mr. Ryan).

44.     Mr. Ryan was an inpatient in a substance abuse treatment program at the Brooklyn Veterans Administration prior to his admission to NCCC. (Exhibit "2" of Warywoda Declaration, Brooklyn Veterans Administration Records for June 2008 through July 11, 2008).

45.     Mr. Ryan had previously detoxed from heroin using methadone due to symptoms of withdrawal including nausea and muscle aches. (Exhibit "2" of Warywoda Declaration, Brooklyn Veterans Administration Records for June 2008 through July 11, 2008).

46.     On February 6, 2012 Mr. Ryan presented to NVAMC and noted that his goal at the time was to address my PTSD. (Exhibit "1" of Warywoda Declaration, Northport Veterans Administration Records).

47.     On February 13, 2012 Mr. Ryan reported to a psychologist at NVAMC that he currently struggled with nightmares, anxiety and panic attacks and would like to be in treatment for Post Traumatic Stress Disorder.   (Exhibit "1" of Warywoda Declaration, Northport Veterans Administration Records).

48.     On February 13, 2012 a PHQ2 depression screening questionnaire was administered, which scored 6 which is a positive screen for depression, including "little interest or pleasure in doing things nearly every day" and "feeling down, depressed or hopeless nearly every day."

49.     On February 15, 2012, 9 days before Mr. Ryan committed suicide, he presented to the Emergency Room at NVAMC with complaints of anxiety x1 week, suicidal ideations in the past, not at the present time. Denies homicidal thoughts. Ptnt

complaining about depression which he states he has all the time". (Exhibit "1" of Warywoda Declaration, Northport Veterans Administration Records).

50.     On February 20, 2012 Mr. Ryan presented to Holliswood Hospital in order to enter the inpatient PTSD program but due to insurance issues he was unable to be admitted. (L. Ryan Tr. Page 91, Line 2 through Page 97, Line 14).

51.     Mr. Ryan showed signs of depression while he was at the NCCC. (Nurse Mathews records #14).

52.     Nurse Mathews checked that Mr. Ryan had active mental health conditions and was to be put in mental health housing unit and ordered an urgent referral. (Nurse Mathews records).

53.     Dr. Manetti did not order any mental health follow up for Mr Ryan. (Manetti records).

54.     When the AED was initially attached to Mr. Ryan the AED indicated to shock. (Sandra Jones, LPN statement, Exhibit "6" of Warywoda Declaration).

55.     The autopsy report indicated the presence of Fluoxetine (Prozac), propoxyphene (a narcotic pain reliever) and alcohol in his blood and Xanax (an antianxiety medication), fluoxetine, and propoxyphene in the liver.   (Exhibit "10" of Warywoda Declaration, Autopsy report).

56.     No incident reviews were conducted by NCCC including mental health, security and administrative staff being performed in response to earlier suicides in the jail.

57.     Nurse Tinglin was unsure as to when the signs and symptoms of drug

heroin withdrawal will show themselves after the last use of the drug.  (Tinglin Tr. Page 47, Line 20 – 24.

58.    Methadone was available to be prescribed at the NCCC on February 23 and February 24, 2012.  Tinglin Tr., Page 50, Line 22 – Page 51, Line 4).

59.    Mr. Ryan was not prescribed Methadone while he was at the NCCC. (Manetti records).

60.    Mr. Ryan was not on constant supervision at the time of his suicide. (Armor records).

61.    The New York State Commission of Corrections performed an investigation of Mr. Ryan's hanging and determined that Dr. Manetti performed an inadequate psychiatric assessment of Mr. Ryan.  (Exhibit "11" of Warywoda Declaration, New York State Commission of Correction's Final Report).

62.    Mr. Ryan told Dr. Manetti that he had last used drugs a couple days ago. (Armor records).

63.    People with drug addictions who are then incarcerated are at a higher risk of suicide than people who are incarcerated and are not addicted to drugs.  (Manetti Tr. 32, Line 8-13).

64.    Dr. Manetti never received specific training with regards to dealing with psychological issues veterans deal with.  (Manetti Tr. Page 34, Line 4-8).

65.    A person who has been diagnosed with PTSD and shows signs of depression is at an increased risk for suicide.  (Manetti Tr. Page 35, Line 2-12).

66.      A flat affect is a sign of depression.   (Mental Health Screening Form completed by Nurse Mathews' response to #14).

67.      Nurse Tinglin never discuss with Nurse Mathews his findings and the answers given to him by Mr. Ryan during his evaluation.

Dated:  Port Washington, New York
        February 20, 2015

                                        PARKER WAICHMAN LLP
                                        Attorneys for Plaintiff
                                        6 Harbor Park Drive
                                        Port Washington, NY 11050
                                        516-466-6500

                                  By:   _____
                                        Nicholas E. Warywoda

TO:  James R. Scott, Esq.
     Attorneys for Defendants
     County of Nassau
     Office of County Attorney
     One West Street
     Mineola, NY 11501
     E-mail:jscott@nassaucountyny.gov

     Lewis Brisbois Bisgaard & Smith, LLP
     Suzanne Aribakan
     Attorneys for Defendants
     Armor Correctional Health
     Services, Inc. and Armor
     Correctional Health Services
     of New York, Inc.
     77 Water Street, 21st Floor
     New York, NY 10005
     212-232-1300
     Suzanne.Aribakan@lewisbrisbois.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2015, a copy of the Counter-Statement of Material

Facts Pursuant to Local Rule 56.1 in response to Defendants' County of Nassau, County of

Nassau Correctional Center, and Nassau County Sheriff's Department was served via

OVERNIGHT MAIL and e-mail upon:

TO:     James R. Scott, Esq.
        Attorneys for Defendants
        County of Nassau
        One West Street
        Mineola, NY 11501
        Email: jscott@nassaucountyny.gov

        Lewis Brisbois Bisgaard & Smith, LLP
        John J. Doody, Esq.
        Suzanne Aribakan, Esq.
        Attorneys for Defendants
        Armor Correctional Health Services, Inc.
        and Armor Correctional Health Services of New York, Inc.
        77 Water Street, 21st Floor
        New York, NY 10005
        Email: John.Doody@lewisbrisbois.com
        Suzanne.Aribakan@lewisbrisbois.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 20, 2015

_____
NICHOLAS E. WARYWODA