UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
LILYANN RYAN, as Administrator of
the Estate of BARTHOLOMEW RYAN,
deceased, and LILLYANN RYAN,
individually,

                    Plaintiff,          MEMORANDUM & ORDER
                                        12-CV-5343(JS)(SIL)
          -against-

COUNTY OF NASSAU, COUNTY OF
NASSAU CORRECTIONAL CENTER,
NASSAU COUNTY SHERIFF'S
DEPARTMENT, ARMOR CORRECTIONAL
HEALTH SERVICES, INC., and
ARMOR CORRECTIONAL HEALTH
SERVICES OF NEW YORK, INC.,

                    Defendants.
----------------------------------X
APPEARANCES
For Plaintiff:          Nicholas E. Warywoda, Esq.
                        Parker Waichman
                        6 Harbor Park Drive
                        Port Washington, NY 11050

For the County
Defendants:             James R. Scott, Esq.
                        Nassau County Attorney's Office
                        1 West Street
                        Mineola, NY 11501

For the Armor
Defendants:             John J. Doody, Esq.
                        Lewis Brisbois Bisgaard & Smith, LLP
                        199 Water Street, 25th Floor
                        New York, NY 10038

SEYBERT, District Judge:

        Plaintiff Lilyann Ryan ("Plaintiff") commenced this

action on October 22, 2012 on behalf of herself and the estate of

her deceased son, Bartholomew Ryan ("Ryan").  Plaintiff brought

this case against the following Defendants: the County of Nassau, the County of Nassau Correctional Center, and the Nassau County Sheriff's Department (collectively, the "County"); along with Armor Correctional Health Services, Inc. and Armor Correctional Health Services of New York, Inc. (collectively, "Armor," and together with the County, "Defendants"). Plaintiff claims that Defendants are liable for common law negligence, wrongful death, and for civil rights violations pursuant to 42 U.S.C. §§ 1981, 1983, and 1985. (Compl. ¶¶ 82-143.) Pending before the Court are the County's motion for summary judgment (Docket Entry 50) and Armor's motion for summary judgment (Docket Entry 54). For the reasons that follow, both motions are GRANTED IN PART and DENIED IN PART.

BACKGROUND[1]

Ryan was a Marine Corps veteran who served in Iraq. (Pl.'s Dep., Docket Entry 51-6, at 33:4-5, 37:13-24.) After he was honorably discharged, he developed a number of psychological problems and started using heroin. (Armor 56.1 Stmt., Docket Entry 37-1, ¶ 9; Armor 56.1 Counterstmt., Docket Entry 37-2, ¶ 9; Pl.'s Dep. at 20:14-16.). Sadly, Ryan committed suicide on February 24, 2012, while he was an inmate at the Nassau County Correctional

---
[1] The following facts are taken from parties' 56.1 statements, and other evidence submitting in connection the Armor and the County's motions for summary judgment.

Center ("NCCC").  (Armor's 56.1 Stmt., ¶ 2.)  He had been an incarcerated for less than forty-eight hours.  (Armor 56.1 Stmt. ¶ 2.)

Ryan served in the Marine Corps from 2003 to 2007. (Armor 56.1 Stmt. ¶ 5.)  Plaintiff testified that, before Ryan's service, he did not have any mental health problems.  (Pl.'s Dep. at 58:22-59:2.)  After he was discharged, Ryan repaired power washers on a full-time basis in 2009, then worked "odd jobs" in 2010, such as repairing restaurant equipment.  (Armor 56.1 Stmt. ¶¶ 193-95.)  In February 2012, right before he was incarcerated, Ryan procured a job working for collection agency.  (Armor 56.1 Stmt. ¶ 190.)  However, he only worked at the collection agency for a day or two.  (Armor 56.1 Stmt. ¶ 190.)  Ryan lived with his mother, but he did not provide her with financial support, nor did not pay rent.  (Armor 56.1 Stmt. ¶ 197.)  When asked whether Ryan paid for any food while he lived at home, Plaintiff testified that "he would bring in food."  (Pl.'s Dep. 19:2-4.)

Beginning in 2009, Ryan received treatment at three Veterans Administration facilities for psychological and drug-related problems.  (Armor 56.1 Stmt. ¶ 9.)  According to Plaintiff, Ryan received treatment for opiate dependence, withdrawal, and abuse; post-traumatic stress disorder ("PTSD"); depression, anxiety, and dysthymia.  (Pl.'s 56.1 Counterstmt., Docket Entry 37-2, ¶ 9.)

Four weeks before he committed suicide, Ryan told Plaintiff "I think I want to kill myself" while standing in the kitchen. (Armor 56.1 Stmt. ¶ 10.) Upon hearing of her son's desire to commit suicide, Plaintiff made an appointment for Ryan at the Northport Veteran's Administration. (Armor 56.1 Stmt. ¶ 12.) When confronted by Veterans Administration doctors, however, Ryan denied wanting to commit suicide. (Armor 56.1 Stmt. ¶ 14.) Ryan expressed his desire to commit suicide to his mother on two or three occasions, but would subsequently say that he was "just kidding." (Armor 56.1 Stmt. ¶ 20.)

Ryan was arrested for driving under the influence on the Meadowbrook Parkway. (Armor 56.1 Stmt. ¶ 22.) As a result of his arrest, he was sent to Phoenix House, a drug and alcohol treatment facility. (Armor 56.1 Stmt. ¶ 23.) Ryan remained at Phoenix House from October 2011 until February 2012. (Armor 56.1 Stmt. ¶ 26.) During that time, he did not talk of suicidal ideation. (Armor 56.1 Stmt. ¶ 25.)

I. Ryan's Incarceration

Following a Court appearance on February 23, 2012, Plaintiff was remanded to NCCC. (See Armor 56.1 Stmt. ¶¶ 31-32.) He arrived at the facility that same day and met with Correction Officer Michael Archer ("C.O. Archer"), who performed a suicide screening. (Armor 56.1 Stmt. ¶¶ 32-35.) At 2:45 p.m., C.O. Archer asked Ryan questions listed on a suicide screening form in the

order they appeared on the form. (Armor 56.1 Stmt. ¶¶ 36-37.) Ryan answered "yes" to the question "has psychiatric history," but denied having a history of drug or alcohol abuse, and denied ever attempting suicide.[2] (Armor 56.1 Stmt. ¶¶ 38-39; Archer Dep., Docket Entry 55-6, at 37:17-38:16.) Following his suicide screening, C.O. Archer determined that Ryan should be placed in constant observation pending a mental health review. (Armor 56.1 Stmt. ¶ 41.) C.O. Archer testified that "[o]nce you fail[] the psych screening, you are placed under observation and you're constantly being observed wherever you go through the jail." (Archer Dep. 29:14-17.) Although it is undisputed that Ryan failed C.O. Archer's suicide screening, it is disputed whether Plaintiff could properly be classified as a "suicide risk" at that time. (See Archer Dep. at 41:4-12.) Archer testified that if an inmate answers "yes" to eight or more questions during the screening, he is placed on "suicide watch." (Armor 56.1 Stmt. ¶ 46.) However, there is a difference between "suicide watch" and "constant observation." (Armor 56.1 Stmt. ¶ 47.) When it is determined that an inmate requires constant observation, the inmate is placed

---

[2] During his deposition, C.O. Archer was shown a computer printout indicating that Ryan did admit he previously attempted suicide. However, C.O. Archer testified that the document was likely generated after Ryan's death and that it is irreconcilable with the suicide screening questionnaire that C.O. Archer filled out. (See Archer Dep. at 37:17-38:16; Warywoda Decl., Docket Entry 58, Ex. I; Doody Decl., Docket Entry 55, Ex. G.)

on a linear tier with twenty cells and an officer walks up and down the tier "constantly." (Armor 56.1 Stmt. ¶ 47.) But when an inmate is placed on suicide watch, a Corrections Officer sits directly in front of the inmate and the inmate is given a green smock. (Armor 56.1 Stmt. ¶ 47.)

After Ryan's suicide screening, Ryan met with Tanya Tinglin ("Nurse Tinglin"), a registered nurse employed by Armor. (Armor 56.1 Stmt. ¶ 61.) Armor is a corporation that provides medical and health services to inmates at NCCC pursuant to a contract with the County. (Armor 56.1 Stmt. ¶ 3.) Nurse Tinglin testified that when an inmate first arrives at the jail, he is examined by Armor's medical staff. (Armor 56.1 Stmt. ¶ 62.) At 3:50 p.m., Nurse Tinglin asked Ryan about his medical history and filled out a health assessment form about him. (Armor 56.1 Stmt. ¶¶ 61, 64.) Ryan informed Nurse Tinglin that he was bipolar and suffered from PTSD, bipolar, mania, and anxiety. (Armor 56.1 Stmt. ¶ 65.) However, Ryan denied using drugs, and answered "no" when asked "have you ever attempted suicide" and "are you thinking about suicide now." (Armor 56.1 Stmt. ¶ 66; Tinglin Dep., Docket Entry 55-8, at 43:5-16.) Nurse Tinglin noted the psychological disorders Ryan mentioned on her form and referred him to "behavior health" because of his "mental health history." (Tinglin Dep. at 47:25-48:18.)

At 8:50 a.m. the next day, Ryan met with Doctor Vincent Manetti ("Dr. Manetti"), a psychiatrist employed by Armor. (Manetti Dep., Docket Entry 55-10, at 59:8; Armor 56.1 Stmt. ¶ 76.) Ryan told Dr. Manetti that he had a drug problem with heroin and other opiates. (Armor 56.1 Stmt. ¶ 104.) The Initial Mental Health Evaluation Form (the "Mental Health Form") that Dr. Manetti filled out indicates that Ryan took oxycodone and shot a bag of heroin per day, but Dr. Manetti suspected it was more. (Armor 56.1 Stmt. ¶ 112.) Ryan told Dr. Manetti that he was diagnosed with PTSD and Dr. Manetti indicated on the Mental Health Form that Ryan had been taking the psychotropic drug Symbyax at Phoenix House. (Armor 56.1 Stmt. ¶ 114; Manetti Dep. at 59:20-23.) However, Ryan said he had not taken Symbyax for weeks and Dr. Manetti therefore determined that there was no need to give Ryan any psychotropic drugs. (Armor 56.1 Stmt. ¶ 110; Manetti Dep. at 59:15-18.) The Mental Health Form Dr. Manetti filled out also indicates that Ryan denied previously making any suicide attempts. (Armor 56.1 ¶ 116.)

Ryan also told Dr. Manetti that he had been diagnosed with bipolar disorder and PTSD at Phoenix House. (Armor 56.1 Stmt. ¶ 101; Manetti Dep. at 48:10-15.) However, Dr. Manetti opined that Ryan did not seem to have bipolar disorder, because his history was not typical, and he did not show bipolar disorder symptoms. (Armor 56.1 Stmt. ¶ 102.) Dr. Manetti testified that

he did not call Phoenix House to discuss Plaintiff's medical conditions. (Manetti Dep. at 49:5-18.)

Upon learning about Ryan's drug problem, however, Dr. Manetti testified that he became "very concerned" about the possibility that Ryan could suffer from withdrawal "within hours" because of his recent drug use. As a result, Dr. Manetti testified that he decided to "put in a referral to medical . . . regarding that." (Manetti Dep. at 50:18-51:5.) Manetti testified that there are two types of referrals at NCCC, "routine and urgent." (Manetti Dep. at 51:10.) In this case, Manetti's referral regarding Ryan's medical need was marked "urgent," which according to Armor's guidelines, meant that Ryan would be seen by a physician or physician's assistant within twenty-four hours. (Manetti Dep. at 51:11-14, 51:24-52:13.) Dr. Manetti marked Ryan's referral "urgent" because Ryan said he had been shooting heroin prior to his arrest. (Armor 56.1 Stmt. ¶ 108.) Further, Manetti admitted that someone suffering from withdrawal could be at an increased risk of attempting suicide. (Manetti Dep. 65:17-20.) Manetti diagnosed Ryan with opiate dependence, determined that he was "medically stable," and decided that he could be housed with the general population because he did not appear to be a suicide risk. (Armor 56.1 Stmt. ¶¶ 122, 126; Manetti Dep. at 63:12-18.)

Ryan was housed in the mental observation tier of NCCC with four other inmates. (Armor 56.1 Stmt. at 129.) Correction

Officer Robert Vogt ("C.O. Vogt") saw Ryan while he was patrolling the mental observation tier sometime after Ryan met with Dr. Manetti. (Armor 56.1 Stmt. ¶ 155.) According to C.O. Vogt, Ryan's demeanor appeared to be normal and he was "just standing around talking to other inmates." (Armor 56.1 Stmt. ¶ 156.)

In addition to C.O. Vogt, Correction Officer Thomas Killeen ("C.O. Killen") was also on duty on the afternoon of February 24, 2012. While C.O. Killen and C.O. Vogt were walking together down the mental observation tier, they discovered Ryan hanging in his cell. (Armor 56.1 Stmt. ¶ 131.) C.O. Killeen testified that Ryan likely took his life shortly after 3:00 p.m. (Armor 56.1 Stmt. ¶ 130.) C.O. Killen testified that he did not think Ryan was breathing when he opened his cell door. (Killeen Dep., Docket Entry 55-12, at 46:20-23.) C.O. Killeen, C.O. Vogt, and two other officers performed CPR on Ryan to no avail. They subsequently used an AED machine and an Ambu bag to try and revive him.[3] (Armor 56.1 Stmt. ¶¶ 132-136.)

Ryan was taken out of the cell block on a stretcher and an ambulance arrived at 3:30 p.m. to take him to Nassau University Medical Center ("the Hospital"). (Armor 56.1 Stmt. ¶¶ 178, 183,

---

[3] An AED device was attached to Plaintiff's chest, but the device did not advise administering a shock because Ryan had no pulse. (Armor 56.1 Stmt. ¶¶ 169, 182.)

185.)  That same day, the Hospital called Plaintiff and informed her that her son committed suicide.  (Armor 56.1 Stmt. ¶ 185.)

II.  Expert Opinion of Ziv E. Cohen, M.D.

Dr. Ziv E. Cohen, M.D. ("Dr. Cohen"), a professor of psychiatry at Weil Cornell Medical College of Cornell University. (Cohen Aff., Docket Entry 58-13, ¶ 3.)  He submitted an expert affidavit in connection with Plaintiff's opposition to Defendants' motions.  Dr. Cohen provides several opinions about the medical care Ryan received at NCCC.  Initially, Dr. Cohen opines that it was a deviation of the standard of care to delay psychologically evaluating Ryan until the day after he was incarcerated in light of his numerous psychological disorders and potential to experience withdrawal.  (Cohen Aff. ¶ 15.)  Dr. Cohen notes that Ryan was taking the psychotropic drug Symbyax before he was incarcerated and that he last took the drug on February 23, 2012. (Cohen Aff. ¶ 9.)  Based upon these facts, Dr. Cohan opines that Dr. Manetti deviated from the standard of care when he discontinued Ryan's psychotropic medication. (Cohen Aff. ¶ 10.)  In addition, according to Dr. Cohen, determining whether Ryan was going through withdrawal required a clinical assessment, "based on speaking with and directly examining him," and did not require Ryan to be referred to an internal medical doctor.  (Cohen Aff. ¶ 19.) Moreover, Dr. Cohen believes that "it was almost certain that [Ryan] would be in opioid withdrawal at the time of assessment by

Dr. Manetti" because "Ryan had not used in approximately 24 hours or more." (Cohen Aff. ¶ 19.) Moreover, Dr. Cohen opines that Ryan was at a higher risk of committing suicide because he was going through opioid withdrawal, and "the standard of care required that a patient with Mr. Ryan's psychiatric conditions, current symptoms, and opioid withdrawal be maintained on a constant, 1:1 level of observation, and be vigilantly treated for psychiatric conditions and drug withdrawal." (Cohen Aff. ¶¶ 20-21.) Finally, Dr. Cohen opines that Dr. Manetti should have tried to obtain collateral information about Ryan's medical history, in light of Dr. Manetti's determination that Ryan was a "poor historian." (Cohen Aff. ¶ 23.)

III. <u>NCCC's Suicide Prevention Policy</u>

Plaintiff also submitted the expert affidavit of Martin Horn ("Horn") in support of her position that NCCC's suicide prevention policy was inadequate. (Horn Aff., Docket Entry 58-12.) Horn previously served under Mayor Bloomberg as Commissioner of the New York City Department of Probation and Commissioner of the New York City Department of Correction. (Horn Aff. ¶ 2.) Horn opines that NCCC's suicide prevention policy "does not meet the barest requirements" and is merely a "set of procedural instructions." (Horn Aff. ¶ 15.) Specifically, Horn opines that NCCC's policy "does not address elements of communication, coordination[,] and it fails to provide for joint training of

mental health and custodial staff as it should." (Horn Aff. ¶ 15.) Horn also asserts that it was a poor decision to house Ryan in the mental observation tier because "isolation is not good for suicidal inmates." (Horn Aff. ¶ 17.)

Based upon the above facts and opinions, Plaintiff claims that Defendants were deliberately indifferent to Ryan's medical needs and therefore should be held liable to Plaintiff for causing Ryan's death. (See Pl.'s Br., Docket Entry 58, at 2.) Pending before the Court are the County and Armor's motions for summary judgment. (Docket Entries 50, 54.)

DISCUSSION

The Court will first address the applicable legal standard on a motion for summary judgment before turning to the parties' arguments.

## I. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1611, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2512. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256, 106 S. Ct. at 2514). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact."). "The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)). Thus, even if

both parties move for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citation omitted).

## II.  Plaintiff's Section 1983 Claim[4]

Section 1983 provides a vehicle to redress constitutional violations committed by those acting under color of state law. Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999); 42 U.S.C. § 1983. To make out a viable claim pursuant to Section 1983, a plaintiff must show (1) that the challenged conduct was "'committed by a person acting under color of state law,'" and (2) that such conduct "'deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir.

---

[4] As an initial matter, Plaintiff does not oppose Defendants' motions for summary judgment seeking to dismiss Plaintiff's causes of action pursuant to 42 U.S.C. §§ 1981, and 1985. (See Armor Reply Br., Docket Entry 61, at 10.) Therefore, Plaintiff is deemed to have abandoned these claims and they are DISMISSED.

1994)); see also Rosa R. v. Connelly, 889 F.2d 435, 440 (2d Cir. 1989).

Here, Plaintiff claims that Defendants were deliberately indifferent to Ryan's medical needs. "Deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." Bellotto v. Cty. of Orange, 248 F. App'x 232, 236 (2d Cir. 2007). The deliberate indifference standard consists of both an objective and subjective element: (1) objectively, the alleged deprivation of medical care must be "sufficiently serious," and (2) subjectively, "the charged official must act with a sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 279-81 (2d Cir. 2006). In order for a plaintiff to establish deliberate indifference, she must satisfy both the objective and subjective element. See Allah v. Michael, 506 F. App'x 51 (2d Cir. 2012).

A. The Objective Element

The Court must first determine whether the medical deprivation Ryan experienced was "sufficiently serious." "[O]nly those deprivations denying the minimal civilized measure of life's necessities, are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324, 115 L. Ed. 2d 271 (1991) (internal quotation marks

and citation omitted). "Because '[t]he objective component of an Eighth Amendment claim is . . . [necessarily] contextual' and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992)) (alterations in original). Here, the Court's inquiry must focus on both the seriousness of Ryan's medical condition and the adequacy of the care he received at NCCC. See Salahuddin, 467 F.3d 263, 280 (2d Cir. 2006); Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 13 (2d Cir. 2015).

In this case, Ryan informed Nurse Tinglin that he was bipolar and that he suffered from PTSD, bipolar, mania, and anxiety. In addition, Ryan told Dr. Manetti that he was a drug addict and Dr. Manetti was concerned that Ryan would begin to suffer from withdrawal "within hours" because of recent drug use. "Although there is no per se rule that drug or alcohol withdrawal constitutes an objectively serious medical condition, courts in this Circuit have found many such instances to satisfy the objective prong." Iacovangelo, 624 F. App'x 10 at 13 (collecting cases). Certainly, Ryan's withdrawal, combined with his numerous psychological problems amounted to a "sufficiently serious" medical problem that warranted attention by NCCC personnel.

Whether Armor and the County adequately met Plaintiff's serious medical need, however, is a more difficult question, which cannot be resolved as a matter of law. See Rodriguez v. Manenti, 606 F. App'x 25, 27 (2d Cir. 2015) (finding that factual issues existed with respect to the objective prong of the deliberate indifference test). During the two days he was incarcerated at NCCC, Plaintiff was screened for suicide, examined by a nurse, and spoke with a psychiatrist about his psychological conditions and drug use. According Plaintiff's medical expert, however, Armor repeatedly breached the standard of care when assessing Ryan's condition at NCCC. For example, Dr. Cohen opined that it was a deviation of the standard of care to delay psychologically evaluating Ryan until the day after he was incarcerated in light of his psychological conditions; that Dr. Manetti deviated from the standard of care when he decided to discontinue Ryan's psychotropic medication; and that the standard of care required that a patient with Mr. Ryan's psychiatric conditions, symptoms, and opioid withdrawal be maintained on a constant, 1:1 level of observation. In light of the multiple factual questions regarding the adequacy of Ryan's treatment at NCCC, the Court concludes that a reasonable juror could find that the medical deprivation Ryan experienced was "sufficiently serious."

B.  <u>The Subjective Element</u>

The second element of an Eight Amendment claim requires that the defendant acted with "deliberate indifference" to the inmate's medical care.  Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 138 (2d Cir. 2013).  Deliberate indifference is "equivalent to subjective recklessness, as the term is used in criminal law."  Salahuddin, 467 F.3d at 280.  In other words, the "mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."  Id.  Mere "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998); Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) Similarly, a disagreement over proper treatment does not create a "constitutional claim," and thus, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance, 143 F.3d at 703.  "While disagreements regarding choice of treatment are generally not actionable under the Eighth Amendment, judgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment . . . may provide the basis of a claim." Stevens v. Goord, 535 F. Supp. 2d 373, 388 (S.D.N.Y. 2008); Chance, 143 F.3d at 703-04 ("a physician may be deliberately indifferent

18

if he or she consciously chooses 'an easier and less efficacious' treatment plan" on the basis of monetary incentives--or another ulterior motive--rather than sound medical judgment.); Colon v. Cty. of Nassau, No. 12-CV-4466, 2014 WL 4904692, at *7 (E.D.N.Y. Sept. 26, 2014) (finding that the deliberate indifference prong could be satisfied "if Dr. Manetti [ ] denied [the plaintiff] medication based solely [upon] Armor's budget, and not [ ] actual medical need").

    1. Armor

    Armor is a corporation that provides medical and health services to inmates at NCCC pursuant to a contract with the County. As an initial matter, Armor asserts that it cannot be held liable under Section 1983 because it is a private company. (Armor Br., Docket Entry 56, at 15.) However, "anyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983." Filarsky v. Delia, 132 S. Ct. 1657, 1661, 182 L. Ed. 2d 662 (2012) (internal quotation marks and citation omitted). Since "Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates" the Court finds that it was a state actor that can be sued pursuant to Section 1983. Feder v. Sposato, No. 11-CV-0193, 2014 WL 1801137, at *6 (E.D.N.Y. May 7, 2014); Whitenack v. Armor Med., No. 13-CV-2071, 2014 WL 5502300, at *8 (E.D.N.Y. Oct. 30, 2014)

Plaintiff does not assert any claims against any of Armor's employees, but rather names Armor itself as a Defendant. It is established law that private employers are not liable under Section 1983 for torts committed by their employees. Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 408 (2d Cir. 1990) ("Although Monell dealt with municipal employers, its rationale has been extended to private businesses."). Thus, in order to find a private employer liable for an Eighth Amendment violation pursuant to Section 1983, a plaintiff must show that the action that caused the constitutional violation was undertaken pursuant to an official policy. Id.; Bektic-Marrero v. Goldberg, 850 F. Supp. 2d 418, 433 (S.D.N.Y. 2012); Whitenack, 2014 WL 5502300, at *8. For example, in Iacovangelo the Second Circuit found that although a nurse working at a jail acted with deliberate indifference to an inmate suffering from withdrawal, there was no municipal liability because the nurse did not act pursuant to an official policy or custom. Iacovangelo, 624 F. App'x at 1-14. There, an inmate died of myocarditis in a jail in Rochester, New York, allegedly as a result of heroin withdrawal. Id. at 12. A nurse working at the jail failed to refer the inmate to any form of "medically supervised withdrawal," even though she knew the inmate "had a history of drug and alcohol abuse," and the inmate acknowledged being under the influence of drugs at the time of her admission to the jail. Id. at 13. The court held that the

plaintiff properly alleged that (1) the inmate was suffering from a serious medical condition, and (2) the nurse acted with deliberate indifference to the inmate's medical need because the complaint alleged that she knew of the inmate's condition and ignored it.  Id.  In denying the plaintiff's municipal liability claim, however, the court found that the plaintiff did not identify a formal policy "to provide inadequate medically supervised withdrawal," nor did the plaintiff identify any supervisory personnel who acted with deliberate indifference pursuant to that policy.  Id. at 14.

        The facts of this case are similar in some respects to those of Iacovangelo.  In addition to Ryan's psychological issues, it was very likely that Ryan was suffering from withdrawal during his time at NCCC.  By the time Ryan met with Dr. Manetti, he had already been incarcerated for approximately eight hours without receiving any treatment.  The day after he arrived at NCCC, Ryan told Dr. Manetti that he took oxycodone and shot a bag of heroin every day.  Dr. Manetti testified that he was "very concerned" that Ryan would suffer from withdrawal "within hours" because Ryan shot heroin before his arrest.  Dr. Manetti therefore put in an "urgent" referral for Ryan to be seen by additional medical personnel for withdrawal.  But according to Armor's guidelines, an "urgent" referral merely entitled Ryan to be seen by a physician or physical's assistant within a twenty-four hour period.  Despite

Manetti's concern regarding Ryan's imminent withdrawal, he sent Ryan to sit in his cell for potentially an additional twenty-four hours without treatment. Approximately six hours later, Ryan committed suicide. Based upon these facts, a jury could find that Dr. Manetti was deliberately indifferent to Ryan's serious medical condition. Although Dr. Manetti is not a defendant in this action, Plaintiff has also presented evidence that Dr. Manetti's course of action regarding Ryan's withdrawal was taken pursuant to Armor's policy to allow inmates who are "urgently" referred for medical treatment to go for up to twenty-four hours without treatment. If Manetti blindly adhered to Armor's policy and ignored his medical judgment with respect to Ryan's needs, a jury could find that Manetti acted with deliberate indifference and that his action was undertaken pursuant to Armor's policy. Factual issues therefore exist with respect Plaintiff's Eighth Amendment claim against Armor which preclude summary judgment.

> ### 2. The County

Plaintiff argues that the County should be held liable pursuant to § 1983 for its deliberate indifference to Ryan's medical condition because NCCC's suicide prevention policy was inadequate. (Pl.'s Opp. Br., Docket Entry 58, at 19.) Plaintiff relies upon the expert opinion of Marin Horn, Mayor Bloomberg's former Commissioner of Corrections, who opines that NCCC's suicide prevention policy is no more than a loose set of guidelines which

"does not address elements of communication, coordination[,] and it fails to provide for joint training of mental health and custodial staff as it should." (Horn Aff. ¶ 15.) However, "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997) (internal quotation marks and citation omitted). Thus, to survive summary judgment, it is insufficient to merely assert that the County's policy was inadequate, without pointing to a municipal actor who committed a constitutional violation. Since Plaintiff does not assert that any County employee caused harm pursuant to a County policy, the County's motion for summary judgment seeking to dismiss Plaintiff's Section 1983 is GRANTED.

III.  Damages for Pecuniary Loss

Armor argues that Plaintiff's damages for wrongful death in this case must be limited to Ryan's funeral and burial expenses because Plaintiff cannot point to any evidence of pecuniary loss. (Armor's Br. at 23-24.) To prevail on a claim for wrongful death under New York law, a plaintiff must establish the following elements: "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary

loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." See Chong v. N.Y. City Tr. Auth., 83 A.D.2d 546, 547, 441 N.Y.S.2d 24, 25 (2d Dep't 1981). Thus, "to defeat a motion for summary judgment in a wrongful death case, the plaintiff must offer proof of pecuniary loss." Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 317 (S.D.N.Y. 1998) (citing Gonzalez v. N.Y. City Housing Auth., 77 N.Y.2d 663, 668, 572 N.E.2d 598, 601, 569 N.Y.S.2d 915 (1991) (collecting cases). Nevertheless, "because it is difficult to provide direct evidence of wrongful death damages, the calculation of pecuniary loss 'is [generally] a matter resting squarely within the province of the jury.'" Milczarski v. Walaszek, 108 A.D.3d 1190, 969 N.Y.S.2d 685 (2013) (quoting Parilis v. Feinstein, 49 N.Y.2d 984, 985, 406 N.E.2d 1059, 1060, 42 N.Y.S.2d 165 (N.Y. 1980). Here, Ryan was a soldier in the Marine Corps from 2003 to 2007 and worked intermittently from 2007 to 2012. After leaving the Marine Corps, Ryan lived with Plaintiff but did not provide her with any financial support or pay rent. When asked whether Ryan paid for any food while he lived at home, Plaintiff testified that "he would bring in food." (Pl.'s Dep. 19:2-4.) Although Ryan suffered from psychological problems and used heroin, Plaintiff testified that he started working for a collection agency right before he was incarcerated. Although the record concerning potential pecuniary loss is quite limited, the Court cannot find

as a matter of law that Plaintiff suffered no pecuniary injury beyond the recovery of Ryan's funeral expenses.[5]

CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment (Docket Entries 50, 54) are GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's causes of action pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1985 are DISMISSED against both the County and Armor. In addition, Plaintiff's cause of action 42 U.S.C. § 1983 is DISMISSED against the County. Defendants' motions are otherwise DENIED. Thus, the only causes of action that remain are (1) Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Armor and (2) Plaintiff's state law causes of action for negligence and wrongful death against both Armor and the County.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     March   31  , 2016
           Central Islip, New York

---

[5] The costs associated with Ryan's wake and funeral total approximately $12,000. (Armor 56.1 Stmt. ¶188.)