UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
LILYANN RYAN, Individually and as
Administrator of the Estate of
BARTHOLOMEW RYAN, deceased,

                          Plaintiff,                    MEMORANDUM & ORDER
                                                        12-CV-5343(JS)(SIL)
             -against-

COUNTY OF NASSAU, COUNTY OF
NASSAU CORRECTIONAL CENTER,
NASSAU COUNTY SHERIFF'S
DEPARTMENT, ARMOR CORRECTIONAL
HEALTH SERVICES, INC., and
ARMOR CORRECTIONAL HEALTH
SERVICES OF NEW YORK, INC.,

                          Defendants.
----------------------------------X

APPEARANCES
For Plaintiff:          Nicholas E. Warywoda, Esq.
                        Parker Waichman
                        6 Harbor Park Drive
                        Port Washington, NY 11050

For the County
Defendants:             James R. Scott, Esq.
                        Nassau County Attorney's Office
                        1 West Street
                        Mineola, NY 11501

For the Armor
Defendants:             John J. Doody, Esq.
                        Sana Suhail, Esq.
                        Lewis Brisbois Bisgaard & Smith, LLP
                        199 Water Street, 25th Floor
                        New York, NY 10038

SEYBERT, District Judge:

        Plaintiff Lilyann Ryan ("Plaintiff"), individually and

as administrator of the Estate of Bartholomew Ryan ("Ryan"),

commenced this action against the County of Nassau, the Nassau

County Correctional Center, the Nassau County Sheriff's Department (together, the "County Defendants"), Armor Correctional Health Services, Inc., and Armor Correctional Health Services of New York, Inc. (together, the "Armor Defendants" or "Armor," and collectively, "Defendants") on October 22, 2012. (Compl., Docket Entry 1.) On November 14, 2012, Plaintiff filed an Amended Complaint asserting claims under 42 U.S.C. §§ 1981, 1983, and 1985 and state law claims for negligence and wrongful death. (Am. Compl., Docket Entry 7, ¶¶ 108-180.)

After the Court dismissed the claims under Sections 1981 and 1985, and the Section 1983 claim against the County Defendants, the remaining claims proceeded to trial. (See March 2016 Order, Docket Entry 62, at 25.) The case was tried from April 3, 2017 to April 12, 2017, and the following claims were submitted to the jury: (1) a Section 1983 claim for deliberate indifference to medical needs against the Armor Defendants, and (2) negligence and wrongful death claims against the Armor Defendants and the County Defendants. (Verdict Sheet, Court Ex. 3, Docket Entry 108, at 2-9.) On April 12, 2017, the jury reached a verdict in Plaintiff's favor on both claims and awarded $370,000 for pain and suffering on the negligence claim, and $520,000 for pain and suffering and $7,000,000 in punitive damages on the Section 1983 claim. (Verdict Sheet 6(A)-(G).) As to the negligence pain and suffering award, the jury apportioned the fault as follows: twenty-five percent

(25%) to the County of Nassau, fifty-five percent (55%) to Armor, and twenty percent (20%) to Ryan.  (Verdict Sheet 6(D).)

Currently pending before the Court is the Armor Defendants' motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or alternatively, for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(A).  (Armor Mot., Docket Entry 115.)  The County Defendants have not moved for any post-trial relief.  For the reasons that follow, the Armor Defendants' motion is GRANTED.

## DISCUSSION

The Court assumes familiarity with its March 2016 Order resolving the parties' motions for summary judgment and will discuss the evidence presented at trial as necessary in its analysis.  (See generally March 2016 Order.)  Briefly, Ryan was remanded to the Nassau County Correctional Center ("NCCC") on February 23, 2012.  (March 2016 Order at 4.)  After his arrival, he was assessed by a corrections officer, two nurses employed by Armor, and Dr. Vincent Manetti ("Dr. Manetti"), a psychiatrist employed by Armor.  (March 2016 Order at 5-8.)  While Ryan relayed that he had a history of drug abuse and psychological disorders, he did not indicate that he was experiencing suicidal ideations or that he had previously attempted suicide.  (March 2016 Order at 5-7.)  However, he did indicate to Dr. Manetti that he had used heroin immediately prior to his arrival at NCCC.  (March 2016 Order

at 7-8.)  As a result, Dr. Manetti referred Ryan to the medical department for monitoring on an urgent basis, which according to Armor's guidelines, meant that Ryan would be seen within twenty-four hours.  (March 2016 Order at 8, 21.)  Unfortunately, just hours after his visit with Dr. Manetti, Ryan committed suicide. (March 2016 Order at 2, 9.)

I.  The Armor Defendants' Motion for Judgment as a Matter of Law

   A.  Rule 50(b) Standard

        If a party believes that "a reasonable jury would not have a legally sufficient evidentiary basis" to find for its adversary on a particular issue, it may move for judgment as a matter of law during trial under Federal Rule of Civil Procedure 50(a), and renew the motion after trial under Rule 50(b).  FED. R. CIV. P. 50(a)-(b).  In an order determining a Rule 50(b) motion, the district court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  FED. R. CIV. P. 50(b).

        The district court may only grant a Rule 50(b) motion when "'there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair-minded [persons] could not arrive at a verdict against [it].'" Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP, No. 08-

CV-0931, 2015 WL 3605143, at *2 (E.D.N.Y. June 5, 2015) (quoting Kinneary v. City of N.Y., 601 F.3d 151, 155 (2d Cir. 2010)) (alterations in original). In other words, judgment as a matter of law is appropriate only when "'a reasonable juror would have been compelled to accept the view of the moving party.'" Id. at *2 (quoting This is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998)). "When considering the evidence associated with a Rule 50(b) motion, the trial court may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury," Rosioreanu v. City of N.Y., 526 F. App'x 118, 119 (2d Cir. 2013) (internal quotation marks and citation omitted), and must view the evidence "in the light most favorable to the nonmoving party," Houston v. Cotter, No. 07-CV-3256, 2016 WL 1253391, at *1 (E.D.N.Y. Mar. 30, 2016) (internal quotation marks and citation omitted).

   B. <u>Section 1983 Deliberate Indifference to Medical Needs</u>

        To establish a Section 1983 claim, a plaintiff must demonstrate that the defendant violated a "right, privilege, or immunity secured by the Constitution or laws of the United States . . . by a person acting under the color of state law." Charles v. Cty. of Orange, N.Y., No. 16-CV-5527, 2017 WL 4402576, at *6 (S.D.N.Y. Sept. 29, 2017); 42 U.S.C. § 1983. To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee

must establish two elements: (1) that the "deprivation of medical care . . . [was] 'sufficiently serious,'" and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.'" See Smith v. Outlaw, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006); Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed. 2d 811 (1994); see also Grimmett v. Corizon Med. Assocs. of N.Y., No. 15-CV-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017).

The first element requires that the Court assess the seriousness of the deprivation of medical care objectively, including whether "the medical care was inadequate, and if so, . . . how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Smith, 2017 WL 4417699 (internal quotations marks and citation omitted). Further, while courts should tailor the analysis "to the specific circumstances of each case[,] . . . . the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." Id. (internal quotation marks and citations omitted). Generally, the condition must be "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" Grimmett, 2017 WL 2274485, at *3 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). If the plaintiff alleges that medical care was

delayed or interrupted, the appropriate inquiry is whether "the challenged delay or interruption in treatment . . . is, in objective terms, sufficiently serious," to support a claim.  Id. (internal quotation marks, citation, and emphasis omitted).

Prior to the Second Circuit's decision in Darnell v. Pineiro, 849 F.3d 17 (2d Cir. 2017), the second element--whether the defendant acted with a sufficiently culpable state of mind--was evaluated subjectively.  See Grimmett, 2017 WL 2274485, at *4. However, in Darnell, in light of the Supreme Court's decision in Kingsley v. Henderickson, 135 S. Ct. 2466 (2015), the Second Circuit held that the standard for deliberate indifference depends on whether the plaintiff is a pre-trial detainee, in which case the claim arises under the Fourteenth Amendment, or a convicted prisoner, in which case the claim arises under the Eighth Amendment.  Darnell, 849 F.3d at 32-36.  The Second Circuit further held that when a claim arises under the Fourteenth Amendment, "the pre-trial detainee must prove that the defendant-official acted intentionally . . . or recklessly failed to act with reasonable care . . . even though the defendant-official knew, or should have known that the condition posed an excessive risk to health or safety."  Id. at 35; see also Charles, 2017 WL 4402576, at *10. In other words, the second element of a deliberate indifference claim under the Fourteenth Amendment "is defined objectively," and a plaintiff is not required to show subjective awareness by the

defendant that "[his] acts (or omissions) have subjected the pre-trial detainee to a substantial risk of harm."[1]  Darnell, 849 F.3d at 35.  Despite the slightly lower standard articulated in Darnell, which is akin to objective recklessness, "'any § 1983 claim or a violation of due process requires proof of a mens rea greater than mere negligence.'"  Smith, 2017 WL 4417699, at *3 (quoting Darnell, 849 F.3d at 36); see also Grimmett, 2017 WL 2274485, at *4.

In order for a municipality or a corporation such as Armor[2] to be liable for deliberate indifference to medical needs under Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), the plaintiff must "show that the action that caused the constitutional violation was undertaken pursuant to an official policy."  (March 2016 Order at 20.)  Specifically, the plaintiff "must 'demonstrate that, through its deliberate conduct, the [entity] [itself] was the moving force

---

[1] While Darnell involved claims of unconstitutional conditions of confinement, several courts in this Circuit have extended Darnell's holding to claims of deficient medical treatment.  See Grimett, 2017 WL 2274485, at *4 n.2; Smith, 2017 WL 4417699, at *3; see also Charles, 2017 WL 4402576, at *10 ("This standard for deliberate indifference applies to any underlying violation of the due process clause, such as for maintaining unconstitutional conditions of confinement or failing to provide adequate medical care to a person in state custody, 'because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.'") (quoting Darnell, 849 F.3d at 33, n.9.)

[2] The Court previously found that Armor was a state actor for purposes of Section 1983.  (March 2016 Order at 19.)

behind the alleged injury.'" Simms v. City of N.Y., 480 F. App'x 627, 629 (2d Cir. 2012) (quoting Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008)) (second alteration in original). However, "'[a] policy or custom need not be memorialized in a specific rule or regulation;'" "'persistent and widespread'" constitutional violations "can be 'so permanent and well settled as to constitute a custom or usage with the force of law,'" and lead to the imposition of liability. Houston, 2016 WL 1253391, at *7 (quoting Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996); Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992)).

C. Analysis

The Armor Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's Section 1983 claim because the evidence at trial did not establish either element of a deliberate indifference claim. (Armor Br., Docket Entry 117, at 4-5.)

1. The Objective Prong

As to the first element, the Armor Defendants maintain that Plaintiff failed to show that Ryan received inadequate medical care. (Armor Br. at 6-9.) Specifically, they contend that "Armor and its staff followed protocol in processing and evaluating the plaintiff upon his arrival to NCCC . . . and there was simply no notice of Ryan's purported suicidal tendencies prior to and at the

time of his detention." (Armor Br. at 6.) They point out that there were no signs that Ryan was experiencing symptoms of withdrawal or mental illness when he arrived at NCCC. (Armor Br. at 6; see also NCCC Records, Doody Decl., Ex. B, Docket Entry 116-2, at 2.) However, because Ryan indicated that he had taken medication for a psychological condition, he was placed on constant observation until he could be assessed by the mental health department.[3] (Armor Br. at 6.)

Afterward, he was seen by a Licensed Practical Nurse, Joe Mathews ("Nurse Mathews"), and a Registered Nurse, Tanya Tinglin ("Nurse Tinglin"). (Armor Br. at 7; see also Armor Records, Doody Decl., Ex. C, Docket Entry 116-3, at 1-16.) According to the Armor Defendants, the evidence reflects that Ryan told Nurse Mathews that he was previously diagnosed with Post Traumatic Stress Disorder ("PTSD") and was taking medication, and indicated that although he used heroin in the past, he was not currently using drugs. (Armor Br. at 7; Armor Records at 12-13, 16.) After assessing him, Nurse Mathews referred Ryan to the mental health department on a routine basis. (Armor Records at

[3] The suicide prevention screening form (the "Screening Form"), completed by Officer Michael Archer ("Officer Archer"), indicates that Ryan failed the suicide screening because he indicated that he had previously taken medication for a psychological condition. (Screening Form, Doody Decl., Ex. C, Docket Entry 116-3, at 6-7.) The Screening Form indicated that he answered "no" to questions regarding suicidal thoughts and prior suicide attempts. (Screening Form at 6.)

17.) Next, the Armor Defendants assert that when Ryan saw Nurse Tinglin, he reported a history of PTSD, bipolar disorder and anxiety, and denied using drugs. (Armor Br. at 7; Armor Records at 14.) His only complaint was lower back pain, and Nurse Tinglin noted elevated blood pressure during her exam. (Armor Br. at 7; Armor Records at 14.) He denied having any suicidal thoughts or prior suicide attempts. (Armor Br. at 8; Armor Records at 15.)

The next morning, Ryan saw Dr. Manetti and reported that he used heroin two days prior to being remanded to NCCC. (Armor Br. at 8; Armor Records at 20.) He continued to deny suicidal thoughts and prior suicide attempts. (Armor Records at 20.) Dr. Manetti's diagnosis was opiate dependence, and he put in an urgent referral to the medical department to monitor Ryan for symptoms of withdrawal. (Armor Br. at 8; Armor Records at 18, 21.) Dr. Manetti testified at trial that Ryan was not exhibiting any symptoms of withdrawal when he evaluated him, and that he believed that Ryan had actually used heroin more recently than reported. (Trial Tr. (Manetti), Doody Decl., Ex. A, Docket Entry 116-1, 312:13-18.) He declined to continue Ryan's psychotropic medication and recommended that Ryan be housed with the general population. (Armor Records at 19-21.) The Armor Defendants maintain that all of this evidence shows that Ryan received adequate care, and as a result, Plaintiff failed to meet her burden of proof on the first element of her deliberate indifference claim.

Plaintiff argues that the evidence established "an intentional denial or delay of access to medical care." (Pl.'s Opp., Docket Entry 119, at 13.) She contends that Dr. Manetti, following Armor's referral protocol, referred Ryan to the medical department on an urgent basis, even when he knew that it could take as long as twenty-four hours for Ryan to been seen and despite his concerns that Ryan was not being monitored for signs of drug withdrawal. (Pl.'s Opp. at 13; Trial Tr. (Manetti) 346:17-348:10 (testifying regarding his concerns and agreeing that Ryan could wait up to twenty-four hours before he was monitored for withdrawal symptoms).) Further, she points out that Dr. Manetti failed to forward the referral form to the medical department until an hour and a half after his visit with Ryan. (Pl.'s Opp. at 13; Trial Tr. (Manetti) 350:21-351:2.) As a result, Plaintiff argues, Ryan was not being monitored after his visit with Dr. Manetti until he committed suicide. (Pl.'s Opp. at 13.) Plaintiff maintains that, among other things, the evidence established that Dr. Manetti (1) should have sought additional information regarding Ryan's prior treatment for psychological disorders based on his assessment that Ryan was a poor historian, (Trial Tr. (Manetti) 308:2-13 (discussing his characterization of Ryan as a poor historian), 310:4-9 (testifying that the fact that Ryan was a poor historian would be a reason to contact a treating physician or family)), and (2) should have alerted corrections officers that Ryan could

experience withdrawal, (Trial Tr. (Manetti) 302:11-24 (agreeing that it was good psychiatric practice to notify corrections officers of imminent withdrawal), 355:23-356:3 (testifying that he did not tell any corrections officer about Ryan's possible withdrawal).)

On reply, the Armor Defendants argue that because Plaintiff's claim is based on a delay or interruption in care, the Court should evaluate the seriousness of the delay or interruption rather than the seriousness of Ryan's condition alone. (Armor Reply, Docket Entry 121, at 2.) They argue that the evidence shows that Dr. Manetti did not believe that obtaining Ryan's medical records was necessary after his initial evaluation, and that he understood that by referring him to medical, he would be seen within twenty-four hours, which he felt was appropriate based on the fact that Ryan was not exhibiting symptoms during his visit. (Armor Reply at 2; Trial Tr. (Manetti) 337:17-338:7 (testifying that Ryan did not "present in a manner in which I was concerned . . . that I needed that history right away"), 393:8-394:7 (testifying that Ryan was not showing any symptoms of withdrawal, but to be cautious, he put in an urgent referral, which in practice, meant Ryan would seen by the end of the day).) Therefore, the Armor Defendants argue, there was no delay in treatment to support a deliberate indifference claim, and even if there was a delay that could be considered the result of negligence

by Dr. Manetti or other staff, negligence is not sufficient to prove a constitutional violation. (Armor Reply at 2.)

The Court previously concluded that "Ryan's withdrawal, combined with his numerous psychological problems amounted to a 'sufficiently serious' medical problem." (March 2016 Order at 16.) See, e.g., Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 13 (2d Cir. 2015) ("Although there is no per se rule that drug or alcohol withdrawal constitutes an objectively serious medical condition, courts in this Circuit have found many such instances to satisfy the objective prong."). Turning to the adequacy of care, the Armor Defendants maintain that their staff assessed Ryan appropriately, and Dr. Manetti testified that he believed an urgent referral was adequate based on his assessment that Ryan was not experiencing symptoms of withdrawal. (Trial Tr. (Manetti) 393:12-19.) However, Dr. Ziv Cohen ("Dr. Cohen"), a psychiatry expert, testified that Ryan's care was not adequate because Dr. Manetti failed to: (1) treat the situation as a psychiatric emergency, (2) place Ryan under constant observation, (3) continue his psychiatric medication, (4) treat Ryan's withdrawal from heroin, (5) properly diagnose Ryan with PTSD, bipolar disorder, or any other mental health condition, (6) conduct a proper examination for PTSD, (7) order appropriate follow-up care, and (8) seek information from family members or other doctors. (Trial Tr. (Cohen) 675:19-677:6, 682:8-683:3, 698:5-699:1, 699:7-700:10,

14

702:7-703:11.)  Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that there was sufficient evidence for the jury to conclude that the deprivation of care was sufficiently serious.

### 2. The *Mens Rea* Prong[4]

Alternatively, the Armor Defendants argue that the evidence at trial did not establish that any Armor personnel recklessly disregarded a risk to Ryan's health. (Armor Br. at 9-13.)  They contend that "the evidence demonstrated that even if Armor were aware that Ryan might be experiencing signs of withdrawal, they were equally aware that he was subject to ongoing continuous observation patrols as well as 15-minute observations by correctional officers who were trained to recognize the signs and symptoms of withdrawal and advised to notify medical should the inmate appear to be in any distress." (Armor Br. at 10; Trial Tr. (Manetti) 282:18-285:7 (testifying that he participated in suicide prevention training of corrections officers and advised them to call him if any inmate exhibited any suicidal behavior); Trial Tr. (Manetti) 372:14-21 (testifying that corrections officers alerted him to vomiting, cramping, sweating, and signs of agitation by inmates in the past); Trial Tr. (Smith) 235:13-236:19

---

[4] In <u>Darnell</u>, the Second Circuit indicated that this prong should be referred to the <u>mens</u> <u>rea</u> prong, rather than the subjective prong, to prevent confusion.  See <u>Darnell</u>, 849 F.3d at 29.

(testifying that corrections officers were trained to look for signs of withdrawal and would immediately send the inmate to the medical department).)

Further, the Armor Defendants argue that it was reasonable to rely on the corrections officers to notify the mental health or medical departments based on the testimony of several corrections officers who were assigned to Ryan's housing area on the day of his suicide. (Armor Br. at 10; Trial Tr. (Brown) at 435:22-436:4 (testifying that if he determined that an inmate needed medical care, he would alert his supervisor, who would contact the medical department), 442:18-444:8 (testifying that while on the mental health housing tier, he was looking for behavior that would indicate an inmate was depressed and would notice if an inmate was vomiting, sweating profusely, and shaking and would ask the inmate if he needed to go to the medical department); Trial Tr. (Vogt) 482:25-484:6 (testifying that he was trained on signs of suicidal behavior and if an inmate indicated that he planned to hurt himself, the inmate was taken out of his cell and placed in a separate area until mental health department arrived).) Finally, the Armor Defendants point to testimony of several corrections officers that Ryan did not exhibit any unusual behavior that day. (See Trial Tr. (Brown) 448:21-449:7 (testifying that when he conducted a tour of the housing unit, he observed Ryan lying on his bunk); Trial Tr. (Killeen) 533:12-534:4

(testifying that he observed Ryan lying on his bunk).  Officer Vogt specifically testified that he did not observe Ryan suffering any symptoms of withdrawal.  (Trial Tr. (Vogt) 486:18-487:6.)

Plaintiff contends that the appropriate inquiry after the Darnell decision is whether, aware of Ryan's withdrawal, Armor was reasonable in relying on the observations and patrols by corrections officers who were trained to recognize symptoms of withdrawal and patrolled the housing area every fifteen minutes. (Pl.'s Opp. at 15.)  Plaintiff maintains that there was sufficient evidence to support the jury's finding that Armor's reliance was not reasonable, including Dr. Manetti's testimony that he was concerned that Ryan would begin to experience withdrawal and that he was not being monitored for withdrawal.  (Trial Tr. (Manetti) 329:23-25 (Q: "At that point you became very, very concerned he was going to begin going through withdrawal; is that correct?  A: "I thought that was a possibility, yes."), 330:4-6.)  Plaintiff also appears to argue that Dr. Manetti should have seen Ryan sooner in light of the assessments of Officer Archer, Nurse Mathews, and Nurse Tinglin, each of whom noted a history of mental health disorders and drug use.  (Pl.'s Opp. at 15-16.)

Additionally, relying on Dr. Manetti's own testimony, Plaintiff contends that Dr. Manetti acted recklessly by: (1) failing to contact other physicians or family members regarding Ryan's prior treatment and diagnoses, (Trial Tr. (Manetti) 310:4-

9 (testifying that it would be good practice to contact family or treating physicians if patient was a poor historian)); (2) failing to tell corrections officers that Ryan was at risk for withdrawal symptoms, (Trial Tr. (Manetti) 302:11-24 (agreeing that it was good psychiatric practice to notify corrections officers of imminent withdrawal), 355:23-356:3 (testifying that he did not tell any corrections officer about Ryan's possible withdrawal)); and (3) despite his concerns, referring Ryan to the medical department for monitoring knowing that he could wait twenty-four hours to be seen, (Trial Tr. (Manetti) 346:17-348:10 (testifying regarding his concerns and agreeing that Ryan could wait up to twenty-four hours before he was monitored for withdrawal symptoms)). (See Pl.'s Opp. at 16-17.) Moreover, Plaintiff maintains that Armor's argument that it reasonably relied on the corrections officers, even if it was believed by the jury, is irrelevant in light of Dr. Manetti's admission that he never told the officers about his concerns. (Pl.'s Opp. at 17.) In light of this evidence, Plaintiff maintains that there was sufficient evidence to conclude that Dr. Manetti "knew or should have known" that his conduct "posed an excessive risk" to Ryan's health and safety. (Pl.'s Opp. at 18 (internal quotation marks omitted).)

        The Court finds that no reasonable juror could conclude that Dr. Manetti acted with a state of mind sufficient to support a deliberate indifference claim. Focusing on the Darnell standard,

18

there is no evidence that Dr. Manetti intentionally deprived Ryan

of adequate medical care. See Darnell, 849 F.3d at 35 (holding

that "the pre-trial detainee must prove that the defendant-

official acted intentionally . . . or recklessly failed to act

with reasonable care . . . even though the defendant-official knew,

or should have known that the condition posed an excessive risk to

health or safety"). Further, the evidence does not support a

finding that Dr. Manetti "'knew or should have known' that his

actions or omissions . . . 'posed an excessive risk to [Ryan's]

health or safety.'" Lloyd v. City of N.Y., 246 F. Supp. 3d 704,

720 (S.D.N.Y. 2017) (quoting Darnell, 849 F.3d at 35). Dr. Manetti

assessed Ryan, and based on his assessment that Ryan was not

experiencing symptoms of withdrawal at that time, he determined

that the appropriate treatment plan was to refer Ryan to the

medical department on an urgent basis. (Trial Tr. (Manetti) 313:3-

20.) In other words, he recognized the risk that withdrawal posed

to Ryan's health but exercising his medical judgment, concluded

that Ryan did not need treatment immediately.[5]

---

[5] The Court previously denied summary judgment on the deliberate
indifference claim on the basis that "[i]f [Dr.] Manetti blindly
adhered to Armor's policy and ignored his medical judgment with
respect to Ryan's needs, a jury could find that [Dr.] Manetti
acted with deliberate indifference and that his action was
undertaken pursuant to Armor's policy." (March 2016 Order at
22.) No evidence to that effect was presented at trial.

The evidence also does not support a finding that Dr. Manetti was, or should have been, aware of a substantial risk of suicide because Ryan did not indicate to him, Nurse Mathews, Nurse Tinglin, or Officer Archer that he was thinking about suicide or had attempted suicide in the past. (Screening Form at 6; Armor Records at 15-16, 20-21.) Ryan was initially deemed a suicide risk after indicating to Officer Archer that he was prescribed psychiatric medication in the past, but he explicitly denied suicidal thoughts or prior suicide attempts. (Screening Form at 6.) Ryan was then housed in the mental health unit and observed every fifteen minutes until he could be assessed by Dr. Manetti. (Screening Form at 6-7.) Thereafter, he was assessed by Nurse Tinglin and Nurse Mathews, to whom he again denied suicidal thoughts or prior suicide attempts. (Armor Records at 15-16.) He also denied suicide thoughts or attempts during his visit with Dr. Manetti. (Armor Records at 20-21.) Viewing the evidence in Plaintiff's favor, Dr. Manetti may have misjudged the risk of suicide or misdiagnosed Ryan. However, that is not enough to establish objective recklessness.

Plaintiff contends that Dr. Manetti's decision to refer Ryan to the medical department on an urgent basis put him in jeopardy because the referral "meant that an inmate in the throes of withdrawal could be sitting in his cell for up to 24 hours before being monitored or receiving treatment for drug

withdrawal." (Pl.'s Opp. at 8.)  However, Dr. Manetti's referral
would not have prevented Ryan from receiving treatment if he needed
it.   Dr. Manetti testified that if an inmate needed medical
attention for an acute condition, the medical department would see
the inmate on an expedited basis.  (Trial Tr. (Manetti) 395:24-
396:9 (testifying that an inmate could alert a corrections officer
who would contact the medical department, and the medical
department would expedite treatment for acute conditions); Trial
Tr. (Manetti) 372:14-21 (testifying that on several occasions,
corrections officers have notified him that an inmate was vomiting,
cramping, sweating, or exhibiting signs of agitation).)  While he
acknowledged that he was not looking for symptoms of withdrawal
when he observed Ryan that day, Officer Brown testified that he
would notify his supervisor if he believed an inmate needed medical
care and that if an inmate was experiencing symptoms such as
vomiting, sweating, or shaking, he would notice.  (Trial Tr.
(Brown) at 435:22-436:4, 437:22-24, 442:18-444:8.)  Officer Vogt
also testified that he was familiar with the symptoms of drug
withdrawal.  (Trial Tr. (Vogt) 486:18-487:3.)  While the evidence
at trial reflected that corrections officers were not responsible
for diagnosing and monitoring inmates for symptoms of drug
withdrawal, (Trial Tr. (Manetti) 313:25-314:5), they were
responsible for observing them for changes in behavior and ensuring

their safety. (Trial Tr. (Manetti) 298:23-299:7; Trial Tr. (Brown) 442:5-444:12; Trial Tr. (Vogt) 479:23-480:11.)

The Court is cognizant of its obligation to view the evidence in the light most favorable to Plaintiff, and to be sure, there is evidence in the record that Dr. Manetti's actions were a departure from the standard of care. Dr. Cohen testified at length regarding what were, in his opinion, breaches of the standard of care by Dr. Manetti. (See Trial Tr. (Cohen) 675:19-677:6, 682:8-683:3, 698:5-699:1, 699:7-700:10, 702:7-703:11.) However, this testimony supports, at most, a finding of negligence by Dr. Manetti, and it is well established that negligence cannot form the basis of a deliberate indifference claim. See, e.g., Grimmett, 2017 WL 2274485, at *5 ("[N]egligence alone is insufficient to make out a deliberate indifference claim under the Fourteenth Amendment."); Lloyd, 246 F. Supp. 3d at 720 ("'[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.'") (quoting Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)).

### 3. Evidence of a Policy or Custom

The Armor Defendants also argue that "there was no evidence that Armor implemented any policy or custom that resulted in the violation of Ryan's constitutional rights." (Armor Br. at 13.) They maintain that the evidence related to Armor's urgent referral policy was inadequate for several reasons, including

because Ryan was not exhibiting any symptoms of withdrawal when he was seen by Dr. Manetti and because corrections officers testified that if they had noticed any symptoms, they would have taken appropriate action. (Armor Br. at 13-14.)

Plaintiff argues that the evidence regarding Armor's urgent referral policy established the existence of a policy or custom for purposes of Monell liability. (Pl.'s Opp. at 18.) She maintains that "Armor's policy of Dr. Manetti's 'urgent' referral being limited to seeing . . . Ryan sometime in 24 hours contributed directly to his death six hours later. Had 'urgent' meant 'immediately' rather than a day later, . . . Ryan would have survived." (Pl.'s Opp. at 18.) Plaintiff claims that Armor's suggestion that Dr. Manetti did not believe Ryan was in active withdrawal "flies in the face of the evidence," including Dr. Manetti's own testimony that he believed Ryan had used heroin one to two days before arriving at NCCC and that withdrawal typically occurs within twenty-four to forty-eight hours. (Pl.'s Opp. at 18; Trial Tr. (Manetti) 418:18-419:3 (testifying that symptoms of withdrawal usually occur within twenty-four to forty-eight hours and that Ryan committed suicide within one to three days of when Dr. Manetti believed he last used heroin).) Therefore, she argues, because Dr. Manetti followed Armor's urgent referral policy, Ryan was not monitored during the period between his visit with Dr. Manetti and his death, a time period which coincided with when

symptoms of withdrawal typically become apparent. (Pl.'s Opp. at 19.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the evidence at trial failed to demonstrate a "direct causal link" between Armor's referral policy and Ryan's death. See Mayo v. Cty. of Albany, No. 07-CV-0823, 2009 WL 935804, at *3 (N.D.N.Y. Apr. 3, 2009), aff'd, 357 F. App'x 339 (2d Cir. 2009) ("[T]he court's 'first inquiry . . . is the question whether there is a direct causal link between a municipal policy or custom and the constitutional deprivation.'") (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L.Ed. 2d 412 (1989) (second alteration in original). The urgent referral policy--which dictated that an inmate referred on an urgent basis would be seen within twenty-four hours-- effectively set an outside limit on the amount of time an inmate could wait for medical care. Assuming that the evidence established a constitutional violation, the policy did not cause the violation. Plaintiff's theory of the case, which was borne out by the evidence, was that Dr. Manetti misdiagnosed Ryan, failed to treat his drug withdrawal, and failed to recognize the risk of suicide. (Trial Tr. (Opening) 24:12-29:7, 30:19-32:21; Trial Tr. (Closing) 1076:11-1080:10, 1089:20-1095:25, 1097:1-1101:11.) An overwhelming amount of the evidence at trial focused on Dr. Manetti's assessment and his departures from the standard of care,

none of which were the result of any policy set by Armor. (See, e.g., Trial Tr. (Cohen) 675:19-677:6, 682:8-683:3, 698:5-699:1, 699:7-700:10, 702:7-703:11.) Plaintiff argues that the policy caused Ryan's death because if Ryan had been monitored immediately, instead of being sent back to his cell, he would not have committed suicide. (Pl.'s Opp. at 18.) However, Ryan was not monitored immediately because Dr. Manetti found it to be unnecessary based on his assessment that Ryan was not suffering symptoms of withdrawal at that time--not because Armor's policy dictated that he should not be monitored.[6] That Dr. Manetti chose to refer Ryan to the medical department (and as a result, Ryan would be seen within twenty-four hours) does not show that the cause of Ryan's death was the policy. Further, if Dr. Manetti failed to recognize that Ryan was experiencing withdrawal and needed treatment, that deficient assessment was not "undertaken pursuant to an official policy." (See March 2016 Order at 20.) Therefore, assuming that the evidence established a constitutional violation, no reasonable

---

[6] Plaintiff acknowledges this in her opposition brief. (See Pl.'s Opp. at 9 ("As a result of Dr. Manetti's actions, Bartholomew was not being monitored for the signs of heroin withdrawal for those critical six hours . . . between seeing Dr. Manetti and Bartholomew's suicide.") (emphasis added).) Additionally, to the extent that monitoring was arguably delayed as a result of Dr. Manetti's failure to forward the urgent referral form to the medical department until an hour and a half after his visit with Ryan, that delay is attributable solely to Dr. Manetti and was also not the result of any policy promulgated by Armor. (See Trial Tr. (Manette) 350:21-351:10.)

juror could find that Armor's referral policy was the cause of that violation.[7]

### 4. Punitive Damages Award

In light of the Court's determination that the evidence was insufficient to support a deliberate indifference claim, Plaintiff is not entitled to a punitive damages award. However, in the interest of completeness, the Court addresses whether, assuming that Plaintiff had proven her claim, the conduct warranted an award of punitive damages.

The Armor Defendants argue that the punitive damages award should be set aside because "the record is simply devoid of any evidence that Armor acted with callous indifference." (Armor Br. at 15.) Plaintiff responds that there is "testimony that Armor intentionally ignored good medical practice and contemporary community standards in setting a policy of drug withdrawal monitoring that endangered . . . Ryan's life unnecessarily." (Pl.'s Opp. at 19.) She argues that Armor chose not to be provide adequate care for Ryan "by relying on its 'protocol' of denying immediate monitoring for 24-hours." (Pl.'s Opp. at 21.) Additionally, she contends that, based on the evidence, the jury was entitled to infer that Armor intentionally ignored Ryan's medical needs. (Pl.'s Opp. at 21.)

---

[7] See supra note 7.

"In a § 1983 suit, a jury may award punitive damages if 'the defendant's conduct is shown to be motivated by evil motive or intent,' or if the defendant's conduct 'involves reckless or callous indifference to the federally protected rights of others.'" Amid v. Chase, --- F. App'x ----, 2017 WL 5624243, at *5 (2d Cir. 2017) (quoting Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640, 75 L. Ed. 2d. 632 (1983)). The standard requires, at a minimum, subjective recklessness, or "a 'subjective consciousness of a risk of injury or illegality[,] and a criminal indifference to civil obligations.'" Amid, 2017 WL 5624243, at *5 (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536, 119 S. Ct. 2118, 2125, 144 L. Ed. 2d 494 (1999)) (alteration in original).

The Court agrees with the Armor Defendants that the punitive damages award must be set aside. Assuming for purposes of this analysis that Dr. Manetti acted in an objectively reckless manner, there is no evidence that he was "motivated by evil motive or intent" or acted with "reckless or callous indifference." Amid, 2017 WL 5624243, at *5 (internal quotation marks and citation omitted). As discussed above, there is evidence, including the testimony of Dr. Cohen, that Dr. Manetti may have misdiagnosed Ryan or instituted a treatment and monitoring plan that constituted a departure from the standard of care. (See Trial Tr. (Cohen) 675:19-677:6, 682:8-683:3, 698:5-699:1, 699:7-700:10, 702:7-703:11.) While Plaintiff repeatedly cites to Dr. Cohen's testimony

to argue that the punitive damages award should stand, that testimony, standing alone, does not demonstrate that Dr. Manetti was reckless or callously indifferent to Ryan's rights or was aware of the risk to Ryan and disregarded it.

On this point in particular, the Court finds that Plaintiff's characterizations of the evidence are not supported by the record. Plaintiff asserts that "delaying . . . care by 24-hours was a severe departure" from the standard of care and that Armor "chose" not to treat Ryan by relying on its policy of "denying immediate monitoring for 24-hours." (Pl.'s Opp. at 20-21.) However, there was no evidence that Armor delayed care for twenty-four hours; Dr. Manetti, based on his assessment, referred Ryan to the medical department on an urgent basis, which meant that Ryan would be seen within twenty-four hours. (Trial Tr. (Manetti) 393:11-394:7.) The implication that Ryan was subject to a twenty-four-hour waiting period or its equivalent--particularly if he began exhibiting symptoms--is inaccurate. The record is also devoid of evidence that Armor "chose" not to treat Ryan by denying him immediate monitoring. (See Pl.'s Opp. at 21.) Rather, Dr. Manetti determined the course of treatment and decided that immediate monitoring was not necessary based on his observations. Finally, Plaintiff's contention that Dr. Manetti knew that an urgent referral "would delay . . . care for at least 24-hours" is not supported by the record. (See Pl.'s Opp. at 22.) In fact,

Dr. Manetti testified that an inmate referred on an urgent basis would be assessed <u>within</u> twenty-four hours, and in practice, usually by the end of the day on which the referral was made. (Trial Tr. (Manetti) 393:22-394:2.)

As detailed above, no reasonable juror could find that Dr. Manetti acted with a sufficiently culpable state of mind or that Ryan's constitutional rights were violated pursuant to an Armor policy or custom. As a result, Armor's motion for judgment as a matter of law is GRANTED, and the compensatory damages award for the deliberate indifference claim is VACATED. Further, the Court finds that no reasonable juror could conclude that Dr. Manetti acted with the requisite state of mind to support a punitive damages award. Thus, the punitive damages award is similarly VACATED.

II. <u>The Armor Defendants' Motion for a New Trial</u>[8]

In the alternative, Armor moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(A).

A. <u>Legal Standard</u>

A district court may grant a new trial under Federal Rule of Civil Procedure 59 when the "court is 'convinced that the

---

[8] Under Federal Rule of Civil Procedure 50(c), the Court is required to address the Armor Defendants' motion for a new trial despite its ruling that the Armor Defendants are entitled to judgment as a matter of law on the Section 1983 claim. <u>See</u> FED. R. CIV. P. 50(c)(1).

jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Kogut v. Cty. of Nassau, Nos. 06-CV-6695, 06-CV-6720, 2013 WL 3820826, at *2 (E.D.N.Y. July 22, 2013) (quoting Tesser v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 190 F. Supp. 2d 430, 440 (E.D.N.Y. 2002)). On a Rule 59 motion, the district court is permitted to "weigh the evidence" and, unlike a motion under Rule 50, "need not view the evidence in the light most favorable to the verdict winner." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012). Courts in this Circuit have characterized the Rule 59(a) standard as "'less stringent'" than the standard for granting judgment as a matter of law under Rule 50, because, among other reasons, the district court may grant a new trial "'even if there is substantial evidence supporting the jury's verdict.'" Tatum v. Jackson, 668 F. Supp. 2d 584, 598 (S.D.N.Y. 2009) (quoting Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003)).

B. Analysis

1. Compensatory Damages Award

Because the jury found for Plaintiff on the negligence and Section 1983 claim, they completed question number six ("Question 6") on the Verdict Sheet. (See Verdict Sheet at 6-7.) Under Question 6(A), pertaining to negligence, the jury was directed to "state the amount of damages awarded . . . for Decedent's Pain and Suffering," and the jury wrote $370,000.00.

(Verdict Sheet at 6.)  Under Question 6(D), the jury apportioned the fault as follows: 25% to the County of Nassau, 55% to Armor, and 20% to Ryan.[9]  (Verdict Sheet at 7.)  Under Question 6(E), pertaining to the Section 1983 claim, the jury was instructed to "state the amount of damages awarded" and cautioned that "[i]f you awarded damages for Decedent's pain and suffering in Question 6(A), you may only award that amount once."  (Verdict Sheet at 7 (emphasis in original).)  The jury wrote $520,000 in response to that question.  (Verdict Sheet at 7.)

The Armor Defendants argue that the verdict was seriously erroneous because the jury's compensatory damages awards

---

[9] Based on several New York cases, the Court adapted New York Pattern Jury Instruction 2:36 regarding comparative negligence. See Padula v. State of N.Y., 48 N.Y.2d 366, 373, 398 N.E.2d 548, 422 N.Y.S.2d 366 (1979) ("[I]n relation to persons in the custody of the State for treatment of a drug problem, contributory (or comparative) negligence should turn . . . on . . . whether based on the entire testimony presented (including objective behavioral evidence, claimant's subjective testimony and the opinions of experts), the trier of fact concludes that the injured person was able to control his actions."); Mochen v. State of N.Y., 43 A.D.2d 484, 487, 352 N.Y.S.2d 290 (4th Dep't 1974) (discussing that in the context of mental illness, "a plaintiff should not be held to any greater degree of care for his own safety than that which he is capable of exercising"); Arias v. State of N.Y., 195 Misc. 2d 64, 73, 755 N.Y.S. 2d 223 (N.Y. Ct. Cl. 2003) ("The issue of contributory negligence in a suicide case is whether based upon the entire testimony presented, the trier of facts concludes the injured person was able to control his actions.").  See also Gallo v. 800 Second Operating, Inc., 300 A.D.2d 537, 538, 752 N.Y.S.2d 394 (2d Dep't 2002) ("A comparative negligence instruction should be given where there is any valid line of reasoning which could possibly lead rational individuals to conclude that the plaintiff was also at fault.").

31

for pain and suffering are duplicative. (Armor Br. at 18-22.) Specifically, they argue that because the two causes of action-- negligence and Section 1983--arose from the same facts and sought identical relief, the compensatory damages awards constitute a double recovery. (Armor Br. at 18.) They claim that the only explanation for the verdict is that the jury did not follow the Court's instructions on the Verdict Sheet, and as a result, they are entitled to a new trial. (Armor Br. at 19.) Alternatively, they argue that if the Court allows the $890,000 aggregate award to stand, the award must be reduced as it is "clearly excessive." (Armor Br. at 20.) For support, they point to several cases in which "the interval between injury and death [was] relatively short" and argue that those cases, which resulted in damages awards between $300,000 and $500,000, indicate that an award of $890,000 is outside the permissible range. (Armor Br. at 20-21.)

Plaintiff argues that the two pain and suffering awards are not duplicative because the jury found that Ryan suffered two distinct injuries.[10] (Pl.'s Opp. at 22-2r.) Specifically, Plaintiff contends that there were two types of pain and suffering-

_____

[10] Plaintiff makes a passing reference to Federal Rule of Civil Procedure 51, arguing that "Armor's initial consent to the charge and verdict sheet, together with the withdrawal of the question following the verdict[ ] removes this issue from post-verdict review." (Pl.'s Opp. at 24.) Without the benefit of fully developed arguments on this issue, the Court declines to address it.

-the pain and suffering associated with withdrawal and the pain and suffering Ryan experienced during the hanging. (Pl.'s Opp. at 23.) Plaintiff points out that the jury was warned in both the Verdict Sheet and the Court's instructions that compensatory damages should not be awarded "'more than once for the same injury'." (Pl.'s Opp. at 22 (quoting Trial Tr. 1183:2-4).) Thus, in Plaintiff's view, the jury awarded one amount as damages for the pain and suffering from the withdrawal and a different amount as damages for the pain and suffering resulting from the hanging. Plaintiff avers that the idea of separate injuries was discussed in her closing statement because "Plaintiff's counsel bifurcated the pain and suffering from drug withdrawal from the pain and suffering of death by hanging." (Pl.'s Opp. at 24.) In response to the Armor Defendants' argument that the compensatory damages, if allowed to stand, must be reduced, Plaintiff contends that the aggregate amount of $890,000 is not excessive in light of the fact that it compensated Plaintiff for two distinct injuries. (Pl.'s Opp. at 25-26.) She also claims that the cases cited by the Armor Defendants do not support reducing the compensatory damages award. (Pl.'s Opp. at 25-27.)

On reply, the Armor Defendants argue that while Plaintiff maintains that the pain and suffering awards are for different injuries, "[she] fails to explain how they are different and why [s]he attributes particular pain and suffering to one claim

and other pain and suffering to another." (Armor Reply at 5.) Further, they claim that "Plaintiff never . . . presented the jury with any basis to differentiate between components of Ryan's pain and suffering," and in the closing argument, requested one amount for Ryan's pain and suffering. (Armor Reply at 5.) Finally, the Armor Defendants argue that there is no support in the record for Plaintiff's contention that the jury awarded damages for the six-hour period that Ryan allegedly experienced withdrawal, because "there was absolutely no discussion of the symptoms that Ryan actually experienced or the time frame for the onset of these symptoms or how they purportedly progressed." (Armor Reply at 8.)

It is well-established that when awarding compensatory damages, "an injury can be compensated only once"; in other words, "[i]f two causes of action provide a legal theory for compensating one injury, only one recovery may be obtained." Bender v. City of N.Y., 78 F.3d 787, 793 (2d Cir. 1996); see also Conway v. Icahn & Co., Inc., 16 F.3d 504, 511 (2d Cir. 1994) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed."). Moreover, additional damages may be awarded only when "the second cause of action entitles the plaintiff to recover for an injury separate from the injury compensated by the award for the first cause of action, or at least for an additional component of injury not covered by the first cause of action." Bender, 78 F.3d at 793. When the district court

must determine whether damages awards are duplicative, "[t]here is a presumption that a jury's award is valid," and if there is a possibility that the awards are not duplicative, the court may sustain the jury's verdict. E.J. Brooks Co. v. Cambridge Sec. Seals, No. 12-CV-2937, 2015 WL 9704079, at *11 (S.D.N.Y. Dec. 23, 2015) (internal quotation marks and citation omitted) (alteration in original). The defendant cannot overcome that presumption by simply alleging that the jury "allocated the damages under two different causes of action." Gentile v. Cty. of Suffolk, 926 F.2d 142, 154 (2d Cir. 1991) (discussing the allocation of damages between claims under federal and state law).

The Court concludes that, because the awards are likely duplicative, a new trial is necessary.

First, both the negligence and the Section 1983 claim arose from the same facts and there is no indication that Plaintiff was seeking damages for separate injuries. On the contrary, Plaintiff sought damages only for Ryan's pain and suffering. (See, e.g., Trial Tr. 1060:3-8 (agreeing that Plaintiff was not seeking pecuniary damages); Trial Tr. (Manion) 573:8-578:7; Am. Compl. at 24 (praying for a judgment "[a]warding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering and permanent personal injuries sustained by deceased plaintiff"). The jury was presented with the same evidence on both theories and was asked to determine, as to Dr.

Manetti and Armor, whether the conduct at issue arose to the level of a constitutional violation, and/or constituted negligence. In other words, the two theories were alternate theories of liability, and when a plaintiff pursues alternate theories, "only a single recovery is allowed." Conway, 16 F.3d at 511.[11]

Second, there is no support in the record for Plaintiff's argument that the awards were compensation for distinct injuries. As an initial matter, Plaintiff fails to explain which injury is attributable to which legal theory. Additionally, there was no evidence presented at trial regarding the nature of Ryan's alleged pain and suffering due to withdrawal. There was no testimony regarding when symptoms began and what Ryan purportedly experienced before his death. Dr. Cohen testified that he believed that Ryan was in active withdrawal when he saw Dr. Manetti, but there was no testimony from any witnesses who encountered Ryan at NCCC that he was in any pain, distress, or discomfort. (See, e.g., Trial Tr. (Brown) 448:21-449:7; Trial Tr. (Killeen) 533:12-534:4; Trial Tr. (Vogt) 486:18-487:6.)

---

[11] (See also Trial Tr. (Charge) 1183:2-10 ("If you find that the plaintiff is entitled to recovery, I caution that you that should not award compensatory damages more than once for the same injury. If a plaintiff were to prevail on two claims and establish a one dollar injury on each claim, he's entitled to be made whole again, not to recover more than he lost. Of course, if different injuries are attributed to the separate claims, then you must compensate him fully for all of the injuries.").)

As Armor points out, in the summation, Plaintiff asked for one sum to compensate her for Ryan's pain and suffering and did not urge the jury to award different amounts under each theory. (See Trial Tr. 1111:11-17 ("And I submit to you the pain and suffering Bart Ryan endured during those six hours in his cell and for that minute and a half to two minutes when he hung himself, fair and reasonable compensation is $3 million for that pain and suffering, the pain and suffering that caused someone to want to end their own life."). Plaintiff's assertion that she "bifurcated" the pain and suffering--based solely on one sentence in the summation--cannot support the dual pain and suffering awards. (See Trial Tr. 1109:12-16 ("Now, but not only does Bart Ryan--is that pain and suffering but it's pain and suffering that Bart experienced leading to the decision to end the suffering by thinking that the only way out is for me to commit suicide.").

Third, there is no indication that the jury intended to award one sum but divided that sum equally between the two causes of action. See Gentile, 926 F.2d at 154 (affirming denial of post-trial motion when jury awarded $75,000 in damages on state law claim and $75,000 in damages on federal claim because it was "conceivable that the jury found that each plaintiff suffered $150,000 worth of discrete, unduplicated injuries . . . and merely split the total amount equally between the state and federal causes of action" based in part on polling of jury after verdict); Bender,

78 F.3d at 794 (ordering a new trial or remittitur, in part because there was no indication that "the jury intended to award the aggregate sum"). Here, the two awards total $890,000. If the jury intended to award $890,000 and divided the award between the two claims, presumably they would have awarded $445,000 for the negligence claim and $445,000 for the Section 1983 claim. In light of this ambiguity, and the lack of clarity regarding the jury's intent, the Court will not assume that they intended to award the aggregate amount of $890,000.

Because the Armor Defendants sought a new trial in the alternative, the Court conditionally finds that, if its determination on the Rule 50 motion is reversed, a new trial is warranted. See FED. R. CIV. P. 50(c). The parties have not provided a reasonable explanation for the two awards, and the Court struggles to formulate one. Additionally, regardless of the outcome of any future appeal, the Court exercises its discretion and orders a new trial on the negligence claim only. Because the Court granted the Armor Defendants judgment as a matter of law on the Section 1983 claim, only the $370,000 award for negligence against the County and the Armor Defendants remains. However, as discussed, it is unclear how or if the jury allocated damages for pain and suffering between the two causes of action or if they intended to award the aggregate amount. For these reasons, the

Court cannot allow the $370,000 award to stand, and the award is hereby VACATED.

2. Punitive Damages Award

Having found that a new trial is necessary due to the duplicative pain and suffering awards, the Court will briefly address the remaining ground for a new trial.

The Armor Defendants argue that if the Court finds that the evidence supports an award of punitive damages, the Court should reduce the award because the $7,000,000 punitive damages award "clearly shocks the conscience." (Armor Br. at 22.) Based on a collection of cases from this Circuit and others, the Armor Defendants contend that a punitive damages award of, at most, between $100,000 and $200,000 would be appropriate in this case. (Armor Br. at 24.)

Plaintiff responds that the Court should not disturb the jury's punitive damages award because the award does not run afoul of due process and the conduct constituted "a callous prioritizing of self-interest and profit over the responsibility to others for whom Armor was charged." (Pl.'s Opp. at 26-27.) She also distinguishes the cases cited by the Armor Defendants and reasons that cases involving conduct resulting in death are the appropriate metric to determine whether the punitive damages award is reasonable. (Pl.'s Opp. at 27.)

As discussed, the undersigned does not believe that an award of punitive damages is warranted in this case. Assuming that the Court of Appeals disagrees with that conclusion, the Court conditionally rules that, based on the excessiveness of the punitive damages award, a new trial is necessary. The award "is so high as to shock the judicial conscience and constitute a denial of justice." DiSorbo v. Hoy, 343 F.3d 172, 186 (2d Cir. 2003) (internal quotation marks and citation omitted). Moreover, it is clearly excessive under the criteria identified by the Supreme Court in BMW of North America v. Gore, 517 U.S. 559, 574-75, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). In Gore, the Supreme Court discussed "three guideposts for determining whether a punitive damages award is excessive: (1) the degree of reprehensibility; (2) the disparity between the harm or potential harm and the punitive damages award; and (3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases." DiSorbo, 343 F.3d at 186 (citing Gore, 517 U.S. at 574-75, 116 S. Ct. 1589, 1598-99, 134 L. Ed. 2d 809) (internal quotation marks omitted); see also Payne v. Jones, 711 F.3d 85, 101 (2d Cir. 2013). As to the first factor, there is no evidence of the aggravating circumstances that could support a substantial punitive damages award, including evidence that the behavior was violent or "presented a threat of violence," that "defendant acted with malice as opposed to mere negligence" or that "defendant . . . engaged in

repeated instances of misconduct." DiSorbo, 343 F.3d at 186. Under the second factor, "[c]ourts often consider the ratio of the punitive damages award to the compensatory award, and consider whether that ratio is reasonable in the circumstances of the case." Payne, 711 F.3d at 102. However, the Supreme Court and the Second Circuit have declined to issue any "bright-line test, as the propriety of the ratio can vary enormously with the particular facts of the case." Id. In light of the facts of this case, the Court finds the disparity between the compensatory damages award and the punitive damages award (based on the aggregate amount of $890,000 in compensatory damages) to be concerning. Finally, turning to the third factor, the punitive damages award exceeds awards in cases involving intentional and violent conduct. See Mathie v. Fries, 121 F.3d 808, 817 (reducing $500,000 punitive damages award to $200,000 in case involving a sexual assault of inmate by sergeant); King v. Verdone, No. 97-CV-1487, 1999 WL 33432177, at *4-5 (D. Conn. Sept. 30, 1999) (reducing $2,000,000 punitive damages award to $300,000 in excessive force case in which defendants acted violently and "with intentional malice"). The Court recognizes that the conduct at issue in Mathie and King likely resulted in physical and psychological injuries, and not death, but even cases where deliberate indifference led to the death of an inmate have resulted in substantially lower punitive damages awards. See Morris v. Bland, 666 F. App'x 233, 237, 240-

41 (4th Cir. 2016) (declining to reduce $2,450,000 punitive damages award in case where inmate was denied medical care and died). Therefore, the punitive damages award is excessive, and assuming that one was warranted on these facts, a new trial is necessary.

CONCLUSION

For the foregoing reasons, the Armor Defendants' motion for judgment as a matter of law, or in the alternative, for a new trial (Docket Entry 115) is GRANTED. The Court GRANTS the Armor Defendants judgment as a matter of law on the Section 1983 deliberate indifference claim and VACATES the jury's compensatory damages award of $520,000 and punitive damages award of $7,000,000 on that claim. Additionally, the Court finds that a new trial is required on the negligence claim and VACATES the jury's award of $370,000 in compensatory damages for negligence. The parties will be contacted regarding the scheduling of a new trial.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     January __10__, 2018
           Central Islip, New York